## BARNES v. LEHI CITY et al.

No. 4805.   Decided April 23, 1929.   (279 P. 878.)
Rehearing Denied July 27, 1929.

*William H. Bramel,* of Salt Lake City, for plaintiffs.

*J. F. MacLane, George R. Corey,* and *William Story, Jr.,* all of Salt Lake City, amici curiae.

*A. H. Christenson,* of Provo, for defendant Lehi City.

*Dey, Hoppaugh, Mark & Johnson,* of Salt Lake City, for defendant Fairbanks, Morse & Co.

EPHRAIM HANSON, J.

This is an original proceeding in this court, brought upon notice to the defendants, seeking a peremptory writ of prohibition to prevent Lehi City, its mayor and councilmen, from entering into a conditional sales contract with Fairbanks, Morse & Co. for the purchase and installation of a certain electrical generating unit with its accessories. So far as is necessary for a full understanding of the issues presented for consideration and determination, the facts as disclosed by the affidavit and petition of plaintiffs, are:

Plaintiffs are qualified electors residing in Lehi City. They have property upon which they pay taxes to the city. The application is made for their benefit and protection, as well as for the benefit and protection of other property owners and taxpayers in like situation. Lehi is a city of

the third class and has a population of 4,000 people. Defendant Gilchrist is mayor, and defendants Larsen, Fox, Peterson, Lott, and Christopherson are councilmen, of the city. Fairbanks, Morse & Co. is a corporation organized under the laws of the state of Illinois, and it is duly qualified to do business within the state of Utah. Lehi City now owns and operates a municipal electric light and power plant, but the capacity of its plant is not sufficient to supply enough electricity to light the streets of the city and at the same time permit the city to sell light or power to its inhabitants for use while the street lights are burning. To overcome this condition, and provide sufficient facilities to permit the city to furnish light and power to its inhabitants, while the street lights are being used, the mayor and city council, for and on behalf of the city, have made and adopted certain plans whereby it is proposed to enlarge the capacity of the present plant by purchasing a new 180-horse power Fairbanks-Morse Diesel engine generating unit, complete with accessories, together with transmission system, from the defendant Fairbanks, Morse & Co., and to have that company install the same.

The plan further provides that the city shall pay the company for the machinery and the labor incident to its installation the sum of $42,372, to be paid in installments of $588.50 each 30 days, the first payment to be made 60 days after the company informs the city that the plant is ready for operation. All deferred payments are to be evidenced by pledge orders of the city, payable to the order of Fairbanks, Morse & Co., due and delivered on the date of the completion of the installation of the plant. The pledge orders are to bear interest at the rate of 6 per cent per annum, payable semiannually as it accrues, but the installments and interest thereon, the cost of insuring the plant, and the necessary expenses of building the same, are to be paid out of a special fund created by appropriating and setting aside all the proceeds derived by the city from the product or service of the plant. The city "agrees to adopt

resolutions providing for the creation of a special fund into which all receipts for the product or service of said plant shall be deposited, and to credit such fund at the present cost thereof for all product or service of said plant used by the city or any department thereof for any and all public purposes."

In reference to the special fund the contract expressly provides:

"It is agreed that the obligation to pay the deferred instalments of said purchase price and said pledge orders issued in evidence thereof, and to pay for extra time and expenses of the company's engineer, is not a general obligation of the said municipality, payable from taxes or its general funds, but only a special obligation payable from the net revenues of the light and power plant of the municipality. 'Net revenues' shall be deemed to represent the balance of the gross receipts of the municipality's light and power plant after the payment solely of the legitimate and necessary expenses of the operation of said plant. The municipality covenants to operate said plant in an efficient and economic manner, and to maintain rates for the product or service of said plant which will produce sufficient revenue to provide for the payments called for by this contract, so far as it may be permitted to do so by law; such rates, however, shall not exceed rates now charged in Lehi City for like service."

The title and ownership of the machinery or material specified in the contract shall remain in the company or its assignee until final payment therefor is made in full, as provided for in the contract, and shall not pass until all the pledge orders given, or extensions thereof, or any judgments that may be taken, are fully paid in money and satisfied; that machinery and material shall be and remain strictly personal property, and retain its character as such, no matter whether on permanent foundation or in what manner affixed or attached to any building or structure. The city agrees to operate the plant as a municipal plant until all the obligations under the contract have been fully paid and discharged. The proposed contract has been signed by the city but has not been delivered to the company. The

pledge orders provided for in the contract have not been signed or delivered, but on October 9, 1928, the city passed an ordinance creating the special fund provided for in the proposed contract.

It is further alleged in the application for the writ that the city never at any time advertised for bids for the proposed machinery and the installation of the same; that not any part of the expenses incurred, or that will be incurred, under the proposed contract, has been provided for in the budget of the city for the year 1928; that the amount to be paid under the proposed contract in the manner therein provided, added to the present running indebtedness of the city for the current year, will be in excess of the taxes and revenues of the city for such year; that the proposition to authorize such a purchase and payment has never been submitted to a vote of the electors who paid property taxes in Lehi; that no certificate of public convenience and necessity was ever applied for or obtained from the Public Utilities Commission of the state of Utah, to authorize it to enter into the business of selling electrical energy to its inhabitants; that the proposed contract was never submitted to or approved by the Public Utilities Commission; that the proposed contract is ultra vires; that the city has no jurisdiction or power to enter into the proposed contract, and that, unless prohibited by this court, the city, through its mayor and council, and Fairbanks, Morse & Co., will enter into such contract, and thereby cause the plaintiffs and others in the same situation with them great and irreparable loss and damage; that the plaintiffs have no plain, speedy, or adequate remedy in the ordinary course of law for the prevention of the wrongs complained of.

The city, its mayor, and councilmen appeared and jointly demurred to plaintiffs' affidavit and application. Fairbanks, Morse & Co. appeared and filed a separate demurrer thereto. Both demurrers are on the ground that the affidavit and application for a writ of prohibition do not state

facts sufficient to entitle plaintiffs to the relief prayed for, or to any relief.

The only issues between the plaintiffs and defendants are raised by the demurrers, but certain attorneys appearing in the cause as amici curiae have raised the question of the jurisdiction of this court to entertain original jurisdiction of the application for a writ of prohibition under the facts set out in the plaintiffs' affidavit and application. Inas-' much as the question of the court's jurisdiction is one that will be raised by the court sua sponte, such attorneys were given leave to discuss orally and by briefs the question of the jurisdiction of this court to issue the writ applied for by the plaintiffs. That question will first be determined.

Counsel appearing amici curiae contend that, in the provision of our Constitution (article 8, § 4) which confers original jurisdiction on this court to issue the writ of prohibition, the writ referred to is the writ known to the common law, the true office and function of which is █ to prevent an inferior tribunal, board, or individual from exercising judicial or quasi judicial functions, without or in excess of jurisdiction; that the writ as contemplated in the Constitution does not issue to prohibit executive or ministerial acts, without or in excess of jurisdiction. It is next contended by them that, if it be assumed that the writ may be employed to prohibit executive or ministerial acts, it nevertheless will not issue where there is a plain, speedy, and adequate remedy in the ordinary course of law, and that in this case the plaintiffs have such a remedy by injunction.

In support of the first contention we have been referred to the following cases: *Maurer* v. *Mitchell,* 53 Cal. 289; *Camron* v. *Kenfield,* 57 Cal. 550; *State* v. *Hogan,* 24 Mont. 379, 62 P. 493, 51 L. R. A. 958; *Winsor* v. *Bridges,* 24 Wash. 540, 64 P. 780; *State* v. *Ewert,* 36 S. D. 622, 156 N. W. 90; *O'Brien* v. *Board of Com'rs* in and for Humboldt County, 41 Nev. 90, 167 P. 1007; *Stein* v. *Morrison,* 9 Idaho 426, 75 P. 246. We must concede that these cases hold that the writ of prohibition referred to in the Constitution of each

of the respective states in which the cases arose is the writ as known to the common law. However, it will be noted that in each of those states, at the time of the adoption of the Constitution, there was no statutory provision defining the functions of the writ, or, if there was such a statute, its provisions were such that the statute did not restrict or enlarge the common-law functions of the writ. In such circumstances, where the Constitution confers authority on the courts to issue the writ of prohibition, without using other terms enlarging or restricting the office of the writ, it is manifest that the common-law writ is intended. It follows that, after the adoption of a Constitution conferring original jurisdiction upon the Supreme Court to issue the writ of prohibition, and the writ referred to in the Constitution is the common-law writ, the Legislature would have no power to enlarge the functions of the writ. This principle is illustrated in *Maurer* v. *Mitchell* and *Camron* v. *Kenfield,* supra, which are the leading cases on the subject, and were followed in the other cases to which reference has been made herein.

Under the first Constitution of the state of California (1849) the courts of that state had no original jurisdiction to issue any of the common-law writs, except the writ of habeas corpus. In 1862 the Constitution of that state was amended, so that the Supreme Court should "have power to issue the writs of mandamus, certiorari, prohibition and habeas corpus." Const. 1849, art. 6 § 4, as amended. It was not until 1872 that the Legislature of California enacted section 1102 of the Code of Civil Procedure of that state. The full text of that section then was:

"The writ of prohibition is the counterpart of the writ of mandate. It arrests the proceedings of any tribunal, corporation, board or person, when such proceedings are without or in excess of the jurisdiction of such tribunal, corporation, board, or person."

*Maurer* v. *Mitchell,* supra, was decided in 1878. In its decision the court said:

" * * * We are all of opinion that the writ mentioned in the Constitution is the writ of prohibition as known to the common law. Nor does the language of section 1102 of the Code of Civil Procedure require of us to hold that the office of the writ has been extended, or that it should now issue in cases in which it could not have been resorted to prior to the statute."

In March, 1879, a new Constitution was adopted, repeating the words of the old Constitution in reference to the authority of the courts to issue the common-law writs. Const. 1879, art. 6, § 4. In 1881 the Legislature amended section 1102, supra, by inserting the phrase "whether exercising functions judicial or ministerial," for the evident purpose of enlarging the functions of the writ of prohibition, so as to arrest the doing of ministerial acts without or in excess of jurisdiction. The case of *Camron* v. *Kenfield*, supra, was decided in 1881. In its decision the court held that the words in the new Constitution were employed in the sense and meaning that had been attributed to the same words in the former Constitution by the opinion of the court in *Maurer* v. *Mitchell*, supra. In referring to section 1102 as amended in 1881, the court held that the Legislature had no power "to provide that the writ shall arrest the proceedings [in excess of jurisdiction] of any tribunal, corporation, board, or person, 'whether exercising functions judicial or ministerial," in so far as it attempts to extend the office of the writ."

We think the reasoning of the court in both of these cases is sound. They have been approved and followed in many jurisdictions. But we do not regard them as applicable to the situation which prevailed in this state when our Constitution was framed and adopted. Our state Constitution was adopted in 1895. Article 8, § 4, provides that the "Supreme Court shall have original jurisdiction to issue writs of mandamus, certiorari, prohibition, quo warranto and habeas corpus." It is substantially the same as the corresponding provision in the Constitutions of California of 1862 and 1879. In 1884 the territorial Legis-

lature enacted a Code of Civil Procedure, and section 982 thereof defined the writ of prohibition as follows:

"The writ of prohibition is the counterpart of the writ of mandate. It arrests the proceedings of any tribunal, corporation, board or person, whether exercising functions judicial or ministerial, when such proceedings are without or in excess of the jurisdiction of such tribunal, corporation board or person."

The statute is a verbatim copy of section 1102 of the California Code of Civil Procedure as amended in 1881. It was enacted by the Legislature of the territory of Utah three years after the decision of *Camron* v. *Kenfield*, supra. It has been brought forward in every compilation and revision of the laws of the territory and state since its enactment, and is now known as Comp. Laws Utah 1917, § 7407.

The territorial Legislature had authority to adopt the code and to define the functions of the writ of prohibition. The Organic Act (9 Stat. U. S. 454, § 6), in defining the powers of the territorial Legislature, declared:

"It shall extend to all rightful subjects of legislation, consistent with the Constitution of the United States and the provisions of this act."

In discussing the power of the Legislature in this regard the Supreme Court of the United States said:

"We may, I think, assume, without much hazard, that defining the jurisdiction of a probate court, or, indeed of any court, may be fairly included within the general meaning of the phrase rightful subject of legislation." *Ferris* v. *Higley*, 20 Wall. 375, 22 L. Ed. 383.

The territorial Supreme Court regarded the Legislature as having authority to enlarge the functions of the writ of prohibition. *People* v. *House*, 4 Utah 369, 10 P. 838. The court there held, quoting from the syllabus:

"A writ of prohibition could not issue at common law, to arrest the doing of a ministerial act, but the giving to courts of general jurisdiction of the power to issue writs of prohibition for such a purpose is a rightful subject of legislation and within the authority conferred on the legislative power of the territory by section 6 of the Organic Act (9 Stat. 453), and in pursuance of that authority

section 982 of the Code of Civil Procedure (Laws Utah 1884, p. 326) has provided for the issuance of writs of prohibition to arrest the doing of ministerial acts."

In its decision the court referred to *Maurer* v. *Mitchell,* supra, and pointed out that, had the Organic Act of the territory of Utah designated the writ of prohibition by name, as was done in the California Constitution, it might then be argued that, by specifying the writ in the Organic Act, every other character of the writ was thereby excluded.

Again, in *People* v. *Hills,* 5 Utah, at page 413, 16 P. at page 407, the same court held that

"the remedy by writ of prohibition, provided for by our statute (Laws 1884, pp. 326, 327) is the common-law writ recognized and regulated by statute."

See, also, *State ex rel. Robinson* v. *Durand,* 36 Utah 93, 104 P. 760.

From the language of Comp. Laws Utah 1917, § 7407, it is manifest that the Legislature intended to extend the functions of the writ, so as to arrest acts without or in excess of jurisdiction, whether judicial or ministerial. It was so construed by the territorial courts, and its enactment by the Legislature was held to be a rightful exercise of authority. Such was the condition in our territory when our Constitution was adopted in 1895. The men who framed the Constitution undoubtedly were familiar with the statute and the decisions above mentioned.

What, then, was the character of the writ intended by the framers of the Constitution in conferring original jurisdiction upon the Supreme Court to issue the writ of prohibition? Did they have in mind the writ as it was known to the common law or the writ that was known under the laws of the territory and defined by the statute and recognized by the territorial courts? We confidently believe that the framers of the Constitution, in conferring authority upon the Supreme Court to issue the writ of prohibition, had in

mind a writ the character and functions of which were the same as defined by the statute of the territory which was then in existence, and had been in existence for 11 years, and which had been recognized and approved by the courts of the territory, and thus, as was said by the Supreme Court of South Dakota, in *State* v. *Ewert,* 36 S. D. 622, 156 N. W. 90, 95, "to take a forward step and to extend the scope of the function of the writ of prohibition."

At one time the Supreme Court of Idaho held the writ as mentioned in the Idaho Constitution was the same as defined by the statute of Idaho then existing, and which had been in force in the territory for 15 years before the adoption of the Constitution. *Williams* v. *Lewis,* 6 Idaho 184, 54 P. 619. The language of the statute of Idaho territory, however, was not so explicit and definite as is the language of our statute, with reference to the intent and purpose of extending the scope of the writ. It was identical with section 1102 of the California Code of Civil Procedure, as construed in *Maurer* v. *Mitchell,* supra, as being equivalent to the common-law writ. After such construction of section 1102 by the California Supreme Court, the statute was adopted by Idaho.

The case of *Williams* v. *Lewis,* supra, was later reversed (by a divided court) in *Stein* v. *Morrison,* 9 Idaho 426, 75 P. 246. In reversing the case the court did so mainly upon the principle that, where a state adopts a statute of another state, it is presumed that such adopting state likewise adopts the construction that has been placed upon the statute by the courts of the state from which the statute is taken prior to its adoption. But that principle has no application to the situation which prevailed in Utah at the time of the adoption of our Constitution. It is true that Comp. Laws Utah 1917, § 7407, originally was taken from the California Code (section 1102 thereof as amended in 1881), and after the decision in *Camron* v. *Kenfield,* supra; but the decision of the California court did not construe or interpret the statute farther than to say that it was unconstitutional and

void, in so far as it attempted to extend or enlarge the functions of the common-law writ. The statute as amended was adopted by the Legislature of the territory of Utah, not because it was held void by the Supreme Court of California, but because it extended the functions of the writ.

It is next contended by counsel amici curiae that this court should not grant the application for the writ of prohibition, for the reason that plaintiffs have a plain, speedy, and adequate remedy by injunction. As a general rule prohibition will not lie where the applicant has any other plain, speedy, and adequate remedy in the ordinary course of law. When there is another remedy, the writ is not demandable as a matter of right. The writ may, however, be issued in the exercise of a sound judicial discretion. The law on the subject, as now understood, was stated by the Supreme Court of the United States in Re Rice, Petitioner, 155 U. S. at page 402, 15 S. Ct. 152, 39 L. Ed. 198, as follows:

"Where it appears that the court whose action is sought to be prohibited has clearly no jurisdiction of the cause originally, or of some collateral matter arising therein, a party who has objected to the jurisdiction at the outset, and has no other remedy, is entitled to a writ of prohibition as a matter of right. But where there is another legal remedy by appeal or otherwise, or where the question of the jurisdiction of the court is doubtful, or depends on facts which are not made matter of record, or where the application is made by a stranger, the granting or refusal of the writ is discretionary."

The rule there announced was referred to with approval by this court in *Oldroyd* v. *McCrea*, 65 Utah 142, 235 P. 580, 40 A. L. R. 230.

We recognize the importance of placing reasonable restrictions upon the use of the writ of prohibition, and have no desire to encourage the practice of invoking the original jurisdiction of this court by resorting to these extraordinary remedies. This court has, however, in a great many of the cases cited by plaintiffs, entertained applications for writs in situations similar to the situation here involved. We think that the facts and cir-

cumstances of this case justify us in entertaining plaintiffs' application for the writ.

We shall now consider the questions presented by the demurrers. The right and power of Lehi City to purchase and operate its plant is not questioned or doubted by plaintiffs. They contend such right is subject to the jurisdiction of the Public Utilities Commission, and that therefore the city must procure from that body a certificate of convenience and necessity, to authorize it to enlarge its plant and enter into the business of selling electrical energy to its inhabitants. Plaintiffs urge that, because the city has not procured such certificate of convenience and necessity, the city officials are without authority to enter into the proposed contract. This exact question was before this court in the case of *Logan City* v. *Public Utilities Commission* (Utah) 271 P. 961, and was there decided adversely to the plaintiff's contention. Reference to the decision is sufficient to dispose of that question here.

Plaintiffs further contend that the city officials are without authority to enter into the proposed contract, because the proposition to authorize such purchase has never been submitted to the vote of the electors of Lehi City, and because the amount payable under the contract when added to the existing indebtedness of the city is in excess of the taxes for the current year. Section 3 of article 14 of our state Constitution provides that no debt in excess of the taxes for the current year shall be incurred by any city, unless the proposition to create such debt shall have been submitted to a vote of such qualified electors as shall have paid a property tax therein in the preceding year, and a majority shall have voted in favor of increasing the debt. Section 4 places a maximum limit of 4 per cent of the value of the taxable property therein as the indebtedness which a city may incur, with the proviso that a city of the third class, when authorized by vote of the qualified electors, may incur a larger indebtedness, not to exceed 8 per cent

additional, in order to supply such city with water, artificial lights, and sewers.

Whether the undertaking of Lehi City to make the payments in the manner and upon the conditions provided for in the contract in question is prohibited by the Constitution rests upon the question as to whether a "debt" is imposed upon the city by the contract, since it is admitted by the demurrers that no election was called or held. It is defendants' contention that this constitutional provision has no application to the proposed contract, for the reason that no "debt" is incurred by Lehi City under the terms of the contract. This, in our opinion, is the vital question involved in this phase of the case.

By the terms of the contract it is "agreed that the obligation to pay the deferred installments of said purchase price and said pledge orders issued in evidence thereof * * * is not a general obligation of the said municipality payable from taxes or its general funds, but only a special obligation payable from the net revenues of the light and power plant of the municipality," and then only when "there are sufficient moneys in said special fund to make said payments." Does such an undertaking on the part of Lehi City create an "indebtedness" against the city, which is prohibited by the Constitution?

In considering this question, it must be kept in mind that the proceeds of the plant are set aside as a special fund from which the costs and expense of running and maintaining the plant shall be paid, in addition to the payments on the purchase price of the installment. There is a great variance in the meanings given to the words "debt" and "indebtedness" by the courts, in construing these debt limit provisions, but "a careful examination of the decisions discloses the fact that in substantially every jurisdiction the word 'debt' or 'indebtedness,' as used in the limitation placed upon municipal power, is given a meaning much less broad and comprehensive than it bears in general usage." *Swan-*

*son* v. *City of Ottumwa*, 118 Iowa, p. 170, 91 N. W. 1051, 59 L. R. A. 620. See, also, 17 C. J. 1371.

This is not a new question. It has been before the courts in other states a great many times. The proposition came before the Supreme Court of Washington. *Winston* v. *City of Spokane*, 12 Wash. 524, 41 P. 888. In that case money borrowed by the city with which to construct waterworks was secured by bonds payable from a special fund created by impounding a portion of the receipts derived from the waterworks. It was held that no indebtedness was incurred by the transaction. This case is frequently cited by the courts of other states. In its opinion the court said:

"* * * We are of the opinion that neither the ordinance, the contract, nor the obligations to be issued by the city in pursuance thereof, do or will constitute a debt of the city, within the constitutional definition. The only obligation assumed on the part of the city is to pay out of the special fund, and it is in no manner otherwise liable to the beneficiaries under the contract. The general credit of the city is in no manner pledged, except for the performance of its duty in the creation of such special fund. The transaction, therefore, is no more the incurring of an indebtedness on the part of the city than is the issue of warrants payable out of a special fund created by an assessment upon property to be benefited by a local improvement."

In *Shields* v. *City of Loveland*, 74 Colo. 27, 218 P. 913, the Supreme Court of Colorado had before it the same question. The city of Loveland proposed to issue $300,000 additional bonds to complete an electric light plant, payable out of the revenues derived from the operation of the electric light plant. It was contended that the revenue bonds created a "debt" in excess of the lawful limit. The court said:

"We do not think that they amount to a debt within the intent of the Constitution or statute. The definitions of he word 'debt' are many, and depend on the context and the general subject with reference to which it is used. 17 C. J. 1371. Its meaning in the sections of the Constitution and statutes now before us must be determined by their purpose, which was to prevent the overburdening of the public and bankruptcy of the municipality. Clearly the revenue bonds are not within that purpose. The public can never be over-

burdened by that which it is under no obligation to discharge, nor can the city become bankrupt by what it does not have to pay. Nor are these bonds a technical debt."

After the decision of the foregoing case the same questions under the same state of facts were presented to the Eighth Circuit Court of Appeals, with the same result. *Franklin Trust Co. v. City of Loveland, Colo.*, 3 F. (2d) 114.

In *Kasch* v. *Miller,* 104 Ohio St. 281, 135 N. E. 813, the Supreme Court of Ohio recognized and applied the same principle to state improvements constructed and paid for by the sale of bonds. The bonds were payable from a special fund, derived from the sale of water and power generated by the improvements. The fund was expressly pledged for the purpose of maintaining the improvements and for the payment of the interest and principal of the bonds as they matured. The entire issue of bonds was made a lien on the improvements, which, in default of payment, might be fore-closed. It was contended in that case that the law authoriz-ing the issue of bonds for such purpose was in violation of the constitutional provision providing that "except the debts above specified * * * no debt whatever shall hereafter be created by or on behalf of the state." In its opinion the court said:

"Were this the creation of a state debt, or a pledging of its financial credit, directly or indirectly, this court would not hesitate to pro-nounce the legislative act void. But we fail to perceive, even by a strained construction, how the act under consideration, or its mode of operation, violates the provisions of the Constitution. The debt created under the act is not a state debt; the bonds authorized there-under entail no obligation upon the state which it is required, either legally or morally, to assume; the mortgage attaches to no property owned by or purchased with the revenues of the state."

Further:

"No case has been found or cited sustaining the principle that constitutional provisions against the creation of debt apply to a case where the public property was purchased or constructed by private funds and payment therefor made exclusively from the revenues derived therefrom, and from the property itself in case of default."

The opinion in the case of *Uhler* v. *City of Olympia*, 87 Wash. 1, 151 P. 117, 152 P. 998, is instructive as to the nature and character of a fund derived from the revenues of a utility purchased with money from such fund. In the course of the opinion in that case the court said:

"* * * Where the ordinance provides that the cost shall be paid out of the gross revenues of the system when acquired is not a thing to be considered in estimating the debt limit of the city. The charge is upon those who use the water, and not upon others. The revenues to be received under the plan proposed are not moneys of the city. They do not partake of the character of general funds, nor can the general fund be invaded if they are not sufficient. The system for collecting revenues and for the payment of these special bonds, provided by statute and by the ordinance, is in principle the same as if they were collected to pay street assessments."

The opinion is also instructive as to the relation of the municipal corporation to such a fund. On this feature it is said therein:

"It is also contended that the city cannot provide for the payment of a fair rate for rentals for the water used by it as a municipality; this upon the theory that the city cannot purchase from itself. This argument is not sound. If a water plant, acquired as it is proposed to acquire this one, is a separate thing, and the debt incurred is not a general debt, the city is not, save in the most technical sense, purchasing from itself. The city, in meeting functions that are called governmental, is taking from the city as a proprietor a thing held in its proprietary capacity; therefore the general fund of the city may be charged, and the special fund credited, with a reasonable charge for the water used, when it so provided in the ordinance. The city, as a governmental entity, stands in the same relation to the system as a private citizen who is patronizing it."

Public policy favors the freedom of contract. However, the restrictions placed upon municipal corporations by the debt limit provisions of the Constitution must be upheld. The purpose of such provisions is "to serve as a limit to taxation and as a protection to taxpayers." ■ ■■ Mc Quillin, Mun. Corps. (2d Ed.) § 2364. It has now become a well-recognized principle of law that these consti-

tutional provisions do not apply to a case where public property is purchased or constructed, and payment therefor is to be made, exclusively from the revenues derived from the property. In the instant case, impounding the earnings of the electric light and power plant in a special fund which is expressly pledged for the purpose of maintaining the plant and the payment of the interest and purchase price installments as they accrue under the proposed contract casts no additional burden on the taxpayers of Lehi City. When, as here, a uniform rate must be charged for the product of the plant, the burden falls wholly upon the consumers who pay in proportion to the benefits received by them. In making the purchase, the consumers act entirely upon their own volition. They pay for a product furnished them at their own request, and which is essential to their comfort and convenience. The credit of the city is not extended, nor is any money which is derived from taxation or other existing sources of revenue expended, in the purchase price or maintenance cost of the plant. The city cannot be coerced into applying any part of its general revenue for the payment of the purchase price of the plant or for any part of the cost of maintenance thereof.

We are of the opinion that, by entering into the proposed contract with Fairbanks, Morse & Co., Lehi City will not thereby create such an indebtedness as is contemplated and prohibited by section 4 of article 14 of the Utah state Constitution. The doctrine herein expressed is supported by the following authorities: *Larimer County* v. *Ft. Collins,* 68 Colo. 364, 189 P. 929; *Faulkner* v. *Seattle,* 19 Wash. 320, 53 P. 365; *Dean* v. *Walla Walla,* 48 Wash. 75, 92 P. 895; *Scott* v. *Tacoma,* 81 Wash. 178, 142 P. 467; *Schooley* v. *Chehalis,* 84 Wash. 667, 147 P. 410; *Twichell* v. *Seattle,* 106 Wash. 32, 179 P. 127; *Butler & Thompson Co.* v. *Ashland,* 109 Or. 683, 222 P. 346; Id. 113 Or. 174, 232 P. 655; *City of Bowling Green* v. *Kirby,* 220 Ky. 839, 295 S. W. 1004; *State ex rel. Gentry* v. *Curtis* (Mo. Sup.) 4 S. W. (2d) 467; *State ex rel. Smith* v. *Mayor,* etc., of Neosho, 203 Mo. 40, 101 S. W. 99;

*Connor* v. *City of Marshfield*, 128 Wis. 280, 107 N. W. 639; notes, 37 L. R. A. (N. S.) 1058 and L. R. A. 1917E, 437; 6 McQuillin, Mun. Corps. (2d Ed.) §§ 2378, 2379.

To what extent the principle has been approved and followed by the courts may be gathered from the following excerpt from the opinion in *Butler & Thompson* v. *Ashland, supra:*

"The authorities are well nigh unanimous that, where a contract creating an indebtedness provides for a special fund with which to meet the indebtedness as the same accrues, and no general liability is thereby created against the municipality, such an indebtedness is not within the constitutional inhibition against creating a debt in excess of a fixed amount."

The only cases we have been able to find, or which were cited by counsel, holding a contrary doctrine, are *Lesser* v. *Warren,* 237 Pa. 501, 85 A. 839, 43 L. R. A. (N. S.) 839, and *Fail* v. *Coeur d'Alene,* 23 Idaho 32, 129 P. 643, 43 L. R. A. (N. S.) 1095. In the latter case the Supreme Court of Idaho held that a "liability" under the Idaho Constitution would be created by the city of Coeur d'Alene purchasing a system of waterworks, to be paid for out of the earnings of the plant. The decision in that case was by a divided court, and was influenced by reason of the special provision contained in the Constitution of that state, as will be seen by the following excerpts from the prevailing opinion written by Mr. Justice Ailshie:

"* * * The framers of our Constitution employed more sweeping and prohibitive language in framing section 3 of article 8, and pronounced a more positive prohibition against excessive indebtedness, than is to be found in any other Constitution to which our attention has been directed. * * * The Constitution not only prohibits incurring any indebtedness, but it also prohibits incurring any liability 'in any manner or for any purpose,' exceeding the yearly income and revenue."

What has already been said in this opinion disposes of the other two objections raised by plaintiffs. Laws Utah

1925, c. 30, p. 49, provides for a budget system in cities of the third class. From the principles established by the foregoing authorities, it must be held that such statute has no application to the payment of the purchase price installments from the special fund.

There is another provision in the proposed contract, however, wherein the city is required "to credit such fund at the present cost thereof for all product or service of said plant used by the city or any department thereof for any and all public purposes." It is evident that the city will have to take from its general fund to pay into the special fund whatever the product or service of the plant to the city will amount to at the present cost thereof. This feature of the contract has not been discussed by counsel for either plaintiffs or defendants in this proceeding.

In *Shields* v. *City of Loveland,* supra, the contract and the ordinance there in question required the city to pay $5,000 per annum for street lights for not less than 10 years. This the court held not to be a debt, but only a method of paying annually for street lights annually furnished. The general rule is that such contracts, being for services to be paid for periodically, are merely arrangements to pay for current expenses as they are incurred. *Valparaiso* v. *Gardner,* 97 Ind. 1, 49 Am. Rep. 416; *Uhler* v. *City of Olympia,* supra; *City of Laporte* v. *Gamewell Fire Alarm Tel. Co.,* 146 Ind. 466, 45 N. E. 588, 35 L. R. A. 686, 58 Am. St. Rep. 359. See note, 37 L. R. A. (N. S.) at page 1063.

From the plaintiffs' application it is impossible to gather just what this item will amount to, if anything. We deem it immaterial, however, as the contract was not in force during the year 1928, and the budget for the year 1929 was not required to be made until December, 1928. The essential thing to be considered is whether or not, by giving the special fund credit for whatever light and power the city may use during the current year, the current expenses will still be within the current revenues of the city. This is not disclosed by the facts set out in the plaintiffs' application

and affidavit. That such is the true situation is undoubtedly the reason why it was not discussed by either party.

Comp. Laws Utah 1917, § 918, as amended by chapter 14, Laws Utah 1919, provides in substance that, whenever a city council shall contemplate the making of any new improvement, to be paid for out of the general funds of the city, the city must cause plans and specifications to be made, together with the estimated cost thereof and then advertise for bids. Counsel for plaintiffs has raised the objection that in the instant case this statute was not complied with. From what has been said herein upon the other objections, it is clearly shown that the last above mentioned statutory provision has no application whatever to improvements which are to be paid for exclusively out of the proceeds derived from the improvements, which proceeds are not and do not become a part of the general funds of the city.

From what has been said, it follows that the demurrers to the affidavit and application of plaintiffs for a writ of prohibition are well taken, and that therefore they should be sustained. It is ordered that they be, and same hereby are, sustained. The writ prayed for is denied. Neither party herein will be awarded costs.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and FOLLAND, JJ., concur.

## ON PETITION FOR REHEARING.

PER CURIAM. This case was elaborately briefed and argued by counsel for the petitioners, counsel for the city and its officers, and counsel for Fairbanks, Morse & Co., upon all the questions considered in the opinion, and by counsel amici curiae on the question of remedy. We granted what amici curiae urged, a denial of the writ. Counsel amici curiae, on their behalf and on behalf of their client, not a party to the record, now petition us to grant a rehearing and grant the writ.

As is seen by the opinion, we denied the writ, not on the ground, urged by amici curiae, that the remedy by prohibition sought by the petitioners was not the proper or appropriate remedy, that the petitioners had an adequate remedy by injunction, and hence the office of the writ of prohibition could not properly be employed to prohibit or restrain what was sought to be restrained by the petitioners, but on the ground that the threatened alleged commission of the acts of the city and of its officers was not without or in excess of the power or jurisdiction of the city. Hence counsel amici curiae, on their own behalf and on behalf of the Utah Power & Light Company, engaged in the manufacture and sale of electrical energy for light, power, and domestic purposes, an alleged taxpayer and for the first time appearing in the case, filed a petition for a rehearing, and also a petition in intervention on behalf of the company, asking that it now be permitted to intervene in the cause. They do not ask to modify or to be further heard on the question of remedy, but to be further heard on the grounds on which the writ was denied. That right is asserted by the company as a taxpayer.

Upon the service of a verified petition of the petitioners, and upon notice to all of the parties, the city, its officers, and to Fairbanks, Morse & Co., an application was made for a permanent writ of prohibition. All of the defendants to the cause appeared and filed a general demurrer to the petition. Thereunder it was claimed by all of the defendants that the petitioners had another remedy, and that the acts sought to be restrained were within, and not without or in excess of, the power and jurisdiction of the city and its officers. Elaborate briefs were filed and oral arguments had by the parties on all of such questions. Counsel amici curiae filed a rather elaborate brief as to remedy, and asked that the writ be denied. They had the opportunity and privilege to discuss all other questions raised by the general demurrer, but did not do so. The parties themselves presented and submitted the cause on

the general demurrer. None of them desired to further plead, or to further proceed with the cause. All of them submitted to the decision as a final determination of all of the issues presented by the petition. None of them applied for any further hearing, or for any change or modification of the decision. All of the parties to the litigation, both plaintiffs and defendants, object to counsel amici curiae, either on behalf of themselves or on behalf of the power company, to be further heard or to the granting of a rehearing. They in effect urge that, when the decision was rendered and accepted by all of the parties to the cause as final, and none of them desiring to be further heard, counsel as friends of the court, having no control or management of the case, are not entitled to petition for a rehearing or to be further heard. We think the objection is well taken. 2 C. J. 1325. Indeed, it is not seriously disputed by counsel amici curiae. They, however, assert the right to be further heard for reasons presently to be noted.

All of the parties to the cause also object to permitting the power company at this stage of the proceeding to intervene or be heard, either on a petition for a rehearing or for intervention. They urge that under Comp. Laws Utah 1917, § 6518, whatever right, if any, the power company as a taxpayer or otherwise had to intervene was required to be asserted before or at the hearing, or at least before judgment, and that leave to intervene may not now be granted; that since the case has gone to judgment, and all of the parties to the record submitting to it, a mere stranger to the record may not now seek to disturb it by filing a petition for a rehearing to enable him to intervene or otherwise to be heard in the cause. All this, too, is not seriously disputed, and no contention made to the contrary, except for what now will be noticed.

Counsel amici curiae, in all of the proceedings in the case up to the time the decision was rendered and filed, appeared only as friends of the court, and in no other capacity. As

such they were permitted and had the opportunity to suggest and urge whatever on the record they desired to suggest or urge, not only with respect to remedy, but also as to whether the alleged threatened acts of the city were or were not within its power or jurisdiction, and as to whether the city or its officers ought or ought not be restrained and prohibited. Counsel amici curiae now urge that the reason they in oral argument and in their brief discussed only the question of remedy was that in the course of the oral argument they suggested to the court that, if their position on the question of remedy was held against them, they desired to be further heard, and that they in such event might desire to intervene on behalf of the power company, and that the presiding justice indicated that such leave would be granted. No order respecting the matter was made, nor was asked to be made. When counsel later filed their brief, no suggestion or request was therein made to be further heard or to intervene.

Counsel for the parties, however, while admitting that at the oral argument counsel amici curiae said something respecting an intervention, dispute that counsel said they desired to intervene on behalf of the power company. In reply to that counsel amici curiae stated that all concerned in the proceeding well knew they were also counsel for the power company, and well knew that whatever reference was made to an intervention was for and on behalf of that company. There is no doubt that something concerning the matter was stated by counsel at the oral argument, but just what it was is not clearly remembered by the members of the court present at the argument. Such matters ought not to rest on the mere memory of the court or of counsel. Both must act and speak by the record and concerning what is of record.

Inasmuch, however, as counsel assert they relied on what they claimed was indicated to them with respect to being further heard and to an intervention, and as we do not wish counsel to be misled by whatever might have been said or

indicated by the presiding justice, we indicated to counsel that we would entertain a brief on merits in support of their petition to intervene and to be further heard on behalf of the power company. Such a brief was filed, as well as a reply thereto by counsel for all of the parties. Regardless of the question of time within which such an application is required to be made, we think the petition on the merits is groundless.

The chief grounds on which the company desires to intervene and be heard are (1) that Fairbanks, Morse & Co., by reason of the contractual relation created by the contract between it and the city, was itself engaged in the business of a public utility, and before the construction of the plant and lines it was required to obtain a certificate or permit of necessity from our Public Utilities Commission; (2) that the city, by entering into the contract, relinquished or delegated to Fairbanks, Morse & Co. the right to fix rates for electrical service, which, it is contended, the city had no authority to do; and (3) that, if the contract was valid and within the power of the city to enter into, the city itself was carrying on, or about to carry on, a business of a public utility, and hence, before commencing the construction of the plant or system, or engaging in the business, it was required to obtain a permit or certificate of necessity from the commission.

The first and second points are largely predicated on provisions of the contract referred to in the opinion, whereby it was stipulated that the title to the Deisel engine and accessories to be sold to the city by Fairbanks, Morse & Co. was to remain in the company until the purchase price was paid, and whereby the city obligated itself to maintain sufficient rates for service of the plant to raise sufficient revenue to meet the payments provided for by the contract. That, it is contended, made Fairbanks, Morse & Co. a public utility, and subject to the control and regulation of our Utilities Commission, and required the company to first obtain a permit or certificate of necessity; and that the city

by agreeing to maintain sufficient rates to meet the payments constituted a delegation of rate fixing and charges. We think the claim is untenable and does not require a discussion of it.

The further point is based on the proposition that, inasmuch as the city was not engaged in manufacturing or furnishing electrical energy, either for itself or for its inhabitants, when the act creating our Public Utilities Commission became effective, the city, to now engage in such business, before commencing the construction of such a plant or system, was required to obtain a permit or certificate of necessity from the commission, and that such a question was not involved or decided in the Logan City Case referred to in the opinion. We think that also is without merit. The clear purport of the Logan City decision is that, because of the constitutional provision there referred to, municipalities owning, operating, and conducting electric plants for their own use and for the use of their inhabitants are not subject to the regulation or control of the commission; that the commission has no jurisdiction over such municipally owned and operated plants. We adhere to that.

The recalling of our opinion, or the granting a rehearing, either on the petition of counsel amici curiae, or the petition in intervention on behalf of the power company, is therefore denied.