CP NATIONAL CORPORATION, a corporation, Plaintiff,

v.

PUBLIC SERVICE COMMISSION OF UTAH, Milly O. Bernard, David R. Irvine and Brent H. Cameron, Commissioners of the Public Service Commission of Utah, Defendants.

CEDAR CITY, Brian Head, Enoch, Paragonah, Parowan, Kanab, Enterprise, Hurricane, Ivins, LaVerkin, Leeds, New Harmony, St. George, Santa Clara, Springdale, Toquerville, Virgin and Washington, Municipal Corporations of the State of Utah, Plaintiffs and Appellants,

v.

CP NATIONAL CORPORATION, a corporation; and Utah Power & Light Company, a corporation, Defendants and Respondents.

Nos. 17316, 17324.

Supreme Court of Utah.

Nov. 2, 1981.

---

E. Scott Savage, Salt Lake City, for plaintiffs and appellants.

Craig Rich, Salt Lake City, George K. Fadel, Bountiful, Sidney G. Baucom, Helen J. Edwards, Salt Lake City, for defendants and respondents.

HOWE, Justice:

Plaintiffs-Appellants in Case No. 17324 are eighteen cities and towns in this state (municipalities) which initiated this eminent domain proceeding to condemn the assets of CP National Corporation (CPN), a public utility which furnishes electricity to customers in Iron, Washington and Kane counties where the municipalities are located, and which is regulated by the Utah Public Service Commission. Because it claimed an interest in the assets of CPN by virtue of having entered into a conditional contract to purchase them, Utah Power & Light Company (UP&L), was joined as a defendant. UP&L and CPN (utilities) filed motions to dismiss the action pursuant to Rule 12(b) and (c), Utah Rules of Civil Procedure. Those motions were granted by the trial court, and the municipalities bring this appeal.

The critical issue before this Court is whether the municipalities possess the authority to condemn an existing and operating power system by eminent domain. If they do have that authority, the second issue is whether their operation of the system would be "a more necessary public use" than its present operation. The final issue is whether a court can properly assert jurisdiction over condemnation of a utility when utility ownership is already within the jurisdiction of the Public Service Commission.

The municipalities formed an agency called the Southwest Power Agency under the Interlocal Co-Operation Act, § 11–13–1, et seq., Utah Code Ann. 1953, in order to finance and to acquire electric light and power works for their respective municipalities. CPN desired to terminate its operation in Utah. The municipalities negotiated with CPN for the purchase of its entire system until CPN finally informed them of its decision to sell it to UP&L. The municipalities then notified CPN that unless a negotiated purchase or some other satisfactory response relating to a purchase was accomplished with them, the Agency or its municipal members would commence a condemnation proceeding. Thereafter, UP&L filed for the approval from the Public Service Commission of a conditional contract for the purchase of the CPN system. The municipalities then brought suit to condemn the CPN system.

In the condemnation proceeding, the municipalities sought to acquire all the assets of CPN in Iron, Washington and Kane counties, and any adjoining county in Utah in which any part of their system (used or useful in serving power to the municipalities) was located. Although the municipalities expressly excluded from the taking cash, accounts receivable, and unrelated records and documents or property not used or useful in continued operation of the CPN power system in southern Utah, they did seek to acquire all power supply contracts, transmission contracts, and related items necessary or useful in continuing service

under the power system of CPN as it was then constituted and might be constituted upon the date of occupancy by them. While they acknowledged that some part of the power system was located outside the boundaries of the municipalities, they alleged that the entire CPN system must be acquired intact "for subsequent division among the plaintiffs [municipalities] allowing for ownership and control of distribution facilities within a municipality by the municipality, and for joint use and operation of the balance of the system to serve the plaintiffs and all other consumers in the area now served by CPN in Utah."

The legislative grant of authority upon which the municipalities rely to bring this eminent domain action is contained in several sections of our statutes. We turn to a consideration of them.

First, § 11–13–14 of the Interlocal Co-Operation Act provides:

> Any one or more public agencies may contract with each other or with a legal or administrative entity created pursuant to this act to perform any governmental service, activity, or undertaking *which each public agency entering into the contract is authorized by law to perform,* . . . In order to perform such service, activity or undertaking, a public agency may create, construct or otherwise acquire facilities or improvements in excess of those required to meet the needs and requirements of the parties to the contract. In addition, a legal or administrative entity created by agreement under this act, may create, construct or otherwise acquire facilities or improvements to render service in excess of those required to meet the needs or requirements of the public agencies party to the agreement if it is determined by the public agencies to be necessary to accomplish the purposes and realize the benefits set forth in section 11–13–2; . . ." [Emphasis added.]

Section 11–13–15, provides:

> Any two or more public agencies may make agreements between or among themselves:

> (1) For the joint ownership of any one or more facilities or improvements *which they have authority by law to own individually*;

> (2) For the joint operation of any one or more facilities or improvements *which they have authority by law to operate individually*; [Emphasis added.]

The purpose of the Interlocal Co-Operation Act is to facilitate efficient and co-operative use of municipal powers among cities as provided in § 11–13–2. In view of that purpose and the emphasized language above, the intent of the act appears to be to allow municipalities collectively to exercise powers which they already possess individually. In this case, the import of the act is that the municipalities are empowered to organize the Southwest Power Agency but do not possess greater powers to condemn property as an agency than they have individually under our eminent domain statutes.

Section 78–34–1 provides the uses for which the right to condemn may be exercised. Among those uses is the authorization upon which municipalities rely:

> Subject to the provisions of this chapter, the right of eminent domain may be exercised in behalf of the following public uses:

> \*   \*   \*   \*   \*   \*

> (3) Public buildings and grounds for the use of any county, city or incorporated town, or board of education, reservoirs, canals, aqueducts, flumes, ditches or pipes for conducting water for the use of the inhabitants of any county, city or incorporated town; the raising of the banks of streams, removing obstructions therefrom, and widening, deepening or straightening their channels; roads, streets and alleys; *and all other public uses for the benefit of any county, city or incorporated town, or the inhabitants thereof.* [Emphasis supplied.]

The municipalities contend that under § 78–34–1(3) they merely need to show that their operation of the CPN system would be a "public use" which would benefit their

inhabitants in order for them to be authorized to condemn the system. They cite § 10–8–2, § 10–8–14 and § 10–13–14 and conclude, without arguing, that the ownership by a city or town of a power system is undoubtedly a public use which benefits the inhabitants.

Section 10–8–2 authorizes cities to "purchase, receive, hold, sell, lease, convey and dispose of property, real and personal, for the benefit of the city, both within and without its corporate boundaries."

Section 10–8–14 dealing with powers of cities provides:

> They *may construct, maintain and operate* waterworks, sewer collection, sewer treatment systems, gas works, *electric light works*, telephone lines or public transportation systems, or authorize the construction, maintenance and operation of the same by others, or purchase or lease such works or systems from any person or corporation, *and they may sell and deliver the surplus product or service capacity* of any such works, not required by the city or its inhabitants, to others beyond the limits of the city. [Emphasis added.]

Similarly, § 10–13–14 dealing with powers of towns authorizes them to "construct, own and operate artificial light and power plants..."

Clearly, these statutes contemplate and authorize the construction, maintenance and operation of power plants. However, none of them nor § 78–34–1 suggest that the construction, maintenance and operation of a power plant is a public use. The municipalities ask us to so conclude presumably because a municipal power plant provides electric service to the public. That may not be an unreasonable conclusion for this Court to make. See *North Salt Lake v. St. Joseph Water Co.*, 118 Utah 600, 223 P.2d 577 (1950), where we so held with respect to a water system.

The difficulty still remaining, however, is that here the municipalities want to take over an existing power system already constructed, maintained, and operating as an ongoing business. They do not simply seek to acquire property as authorized in § 10–8–2 in order to construct, maintain and operate a power plant. They seek to acquire virtually the entire CPN business including the ability to substitute themselves in CPN's place in its supply and transmission contracts with others.

In *Johnson v. State Tax Commission*, 17 Utah 2d 337, 411 P.2d 831 (1966), at 17 Utah 2d 339, 411 P.2d 831, we stated:

> The fundamental consideration which transcends all others in regard to the interpretation and application of a statute is: What was the intent of the legislature? All other rules of statutory construction are subordinate to it and are helpful only insofar as they assist in attaining that objective. In determining that intent the statute should be considered in the light of the purpose it was designed to serve and so applied as to carry out that purpose if that can be done consistent with its language.

Looking at the fundamental consideration of legislative intent in this case, the question is whether the legislature intended in § 78–34–1(3) to authorize municipalities to condemn an entire public utility system and take over the operation of an ongoing utility business.

The municipalities attempt to find succor for their position in *North Salt Lake v. St. Joseph Water*, supra, where a town condemned water rights and a water system for use of their inhabitants under our eminent domain statutes even though the property which the town condemned belonged to a public utility which was serving the public. That case is readily distinguishable because the legislature has expressly given cities and towns the right to condemn a waterworks system. Section 10–7–4 provides:

> The board of commissioners, city council or board of trustees of any city or town may acquire, purchase or lease all or any part of the water, waterworks system, water supply or property connected therewith, and whenever the governing body of a city or town shall deem it

necessary for the public good such city or town may bring condemnation proceedings to acquire the same; . . .

No such express statutory authority exists for a municipality to condemn a power system. The reason for the legislature giving broad powers to municipalities in the case of waterworks systems may have been because water is a scarce and finite resource which is not capable of manmade generation or replacement as electricity may be.

In *Durfey v. Board of Education*, Utah, 604 P.2d 480 (1970), we held that effect is to be given to every word, clause and sentence of a legislative enactment if such can be reasonably done. In *Snyder v. Clune*, 15 Utah 2d 254, 390 P.2d 915 (1964), we also recognized that:

> . . . attempts to give universal and literal application to statutes frequently lead to incongruous results which were never intended . . . [Therefore] . . . to give a statute its true meaning and significance it should be considered in the light of its background and the purpose sought to be accomplished, together with other aspects of the law which have a bearing on the problem involved. [15 Utah 2d 255, 390 P.2d 915.]

The municipalities ask us to give literal effect to the meaning of "all other public uses for the benefit of . . . the inhabitants" in § 78–34–1(3) *without* giving appropriate effect to every word, clause, and sentence of the statute. It is important to construe this statute in light of another aspect of eminent domain law. Citing Nichols on Eminent Domain, this Court, in *Salt Lake County v. Ramoselli*, Utah, 567 P.2d 182 (1977), at 183, stated, "The power of eminent domain is not to be exercised thoughtlessly or arbitrarily and the courts possess full authority to determine the proper limits of the power to prevent abuses in its exercise." See *Bertagnoli v. Baker*, 117 Utah 348, 215 P.2d 626 (1950), where we strictly construed the powers of Boards of Education to condemn land for school sites, holding that the Boards lack the authority to condemn land outside the boundaries of their school district where that authority had not been given expressly to them by the legislature.

In *Heathman v. Giles*, 13 Utah 2d 368, 374 P.2d 839 (1962), we explained two well-known rules of statutory construction which are helpful in the present case. The rule of noscitur a sociis "requires that the meaning of doubtful words or phrases be determined in light of and take their character from associated words or phrases," and the rule of ejusdem generis requires that "when general words or terms follow specific ones, the general must be understood as applying to things of the same kind as the specific." 374 P.2d at 840.

The general phrase in § 78–34–1(3) upon which the municipalities rely comes at the end of a series of uses which are limited to real property. Such uses as public buildings and grounds, reservoirs, banks of streams, roads and streets are mentioned. By applying the rules of noscitur a sociis and ejusdem generis to "all other public uses" in § 78–34–1(3), it is clear that the general phrase is surrounded by and takes its character from other real property types of uses. The taking of an ongoing public utility business is more than the taking of real or even tangible personal property and is therefore, by the application of these rules, not contemplated within the meaning of § 78–34–1(3). See *Lone Star Gas Company v. City of Fort Worth*, 128 Texas 392, 98 S.W.2d 799, 109 A.L.R. 374 (1936), where Fort Worth was statutorily authorized to condemn an operating public utility provided it had adopted rules; and, the court held that the legislature did not intend that a statute similar to ours, which was designed to provide for the condemnation of real estate, should be used by a city to condemn an operating public utility.

Further, in the context of the broader statutory scheme of the other subsections, it appears that the legislature did not intend to authorize the takeover of an ongoing public utility in § 78–34–1(3). With the exceptions of broader federal, state and legislative grants in subsections (1) and (2), all of the subsections including (3) appear to be relatively specific and real property orient-

ed. The public utility use appears to have been considered and dealt with intentionally. Section 78–34–1(8) specifically provides that "electric light and electric power lines and sites for electric light and power plants" are subject to condemnation for public use. Nowhere is this basic grant broadened by other statutory authority. Clearly, § 78–34–1(8) contemplates a condemnation limited to the "lines and sites" for a power plant. Had the legislature intended to grant more, it is reasonable that it would have done so expressly in § 78–34–1(8) or elsewhere as it did in the case of a waterworks system in § 10–7–4.

*City of Pryor Creek v. Public Service Company*, Okla., 536 P.2d 343 (1975), supports that there no legislative intent to authorize the takeover of an ongoing public utility can be drawn from a phrase such as the municipalities rely upon. In that case, the Oklahoma Supreme Court held that a broad grant of eminent domain power for "any necessary purpose" was insufficient to permit the taking of an electric utility. The court at 536 P.2d 346 stated:

> It is clear that the Legislature was aware that the general powers of eminent domain ... [Citations omitted] ... were not sufficiently broad to permit condemnation of property of a pre-existing public utility already devoted to the same public use as contemplated by the municipality seeking to condemn it. Otherwise the Legislature would not have adopted specific statutes ... [Citations omitted] ... to deal with these problems.

The same statement can be made here. Section 78–34–1(8) obviously contemplates condemnation of power lines and sites as a valid public use and so authorizes it. The legislature adopted this specific statute and purposely included nothing more.

Our conclusion that the municipalities in this case lack the statutory authority to condemn the CPN system with all its tangible and intangible assets finds support in another section of our law. Section 10–8–14 set out above authorizes cities to construct, maintain and operate electric light works and authorizes them to sell and deliver the surplus product or service capacity of such works not required by the city or its inhabitants to others beyond the limits of the city. We believe that this language imposes a limitation on a city operating outside its borders. It negates the proposition that a city could purposely engage in the distribution of power to localities or persons outside its limits except to dispose of surplus. *County Water System v. Salt Lake City*, 3 Utah 2d 46, 278 P.2d 285 (1954). In the instant case, the municipalities intend to continue to serve a large area outside any of their limits, including areas in the unincorporated parts of the three counties and in the incorporated town of Kanarraville.

Section 10–8–14 does not contemplate nor authorize a city to so operate its electric light and power works. There is good justification for this limitation since municipally owned utilities are not subject to the jurisdiction and supervision of the Public Service Commission, but are controlled solely by the administration of the city or town wherein they are located. *County Water System v. Salt Lake City*, supra; *Logan City v. Public Utilities Comm.*, 72 Utah 536, 271 P. 961 (1928); *Barnes v. Lehi City*, 74 Utah 321, 279 P. 878 (1929). Customers who are non-residents of the municipalities would be left at the mercy of officials over whom they have no control at the ballot box, and they could not turn to the Public Service Commission for relief.

Since there is no legislative grant which gives municipalities the authority to condemn an existing power system by right of eminent domain, the secondary issues concerning whether the municipalities' use is "a more necessary public use," and whether a court can properly assert jurisdiction over condemnation of a utility when utility ownership is already within the jurisdiction of the Public Service Commission, need not be reached.

Case No. 17316 is before us on a Writ of Review of a Final Report and Order of the Public Service Commission which required CPN to continue to make improvements to the system in spite of the eminent domain

action by the utilities. CPN seeks a reversal of the order, or, in the alternative, a determination of compensation for improvements. The issues in that case also need not be reached since a determination of them only becomes relevant in the event the lower court ruling in the eminent domain action were to be reversed.

The judgment of the lower court in Case No. 17324 is affirmed and costs are awarded to respondents. The review of the order in Case No. 17316 is rendered moot and the case is dismissed.

HALL, C.J., and STEWART and OAKS, JJ., concur.

MAUGHAN, J., heard the arguments but died before the opinion was filed.