# WADSWORTH et al. v. SANTAQUIN CITY et al.

No. 5488.   Decided December 14, 1933.   (28 P. [2d] 161.)

*Stephens, Brayton & Lowe* and *Calvin Behle,* all of Salt Lake City, for plaintiffs.

*J. Robert Robinson* and *Geo. S. Ballif,* both of Provo, for defendants.

*E. A. Walton,* of Salt Lake City, and *J. A. Howell,* of Ogden, amici curiae.

FOLLAND, JUSTICE.

On petition of plaintiffs an alternative writ of prohibition was issued out of this court prohibiting and restraining the defendants from issuing and selling revenue bonds of the defendant city pursuant to an ordinance theretofore passed and adopted by the city council of Santaquin City. The issues are made by demurrer to the petition, which alleges that the petition does not set forth any cause of action or sufficient ground to warrant the making of the writ of prohibition permanent.

At the hearing of this case the court also heard arguments on the pending motion for rehearing in the case of *Fjeldsted* v. *Ogden City,* 28 P. (2d) 144, theretofore decided. All the issues in both cases were fully briefed and argued by respective counsel. We desire to acknowledge our appreciation of the services of Mr. E. A. Walton and Judge J. A. Howell, members of the bar of this court, who, at our request, appeared as amici curiae, and aided the court by their helpful suggestions and argument.

The petition shows that plaintiffs are taxpaying residents of Santaquin City, and that Santaquin City, hereinafter called the city, is a municipal corporation organized under

general laws as a city of the third class. The other defendants are the mayor, city councilmen, treasurer, and recorder respectively of the city.

The city in 1911 constructed a waterworks system which it now owns and operates, the flow lines of which were largely of wood-stave pipe. By the year 1929 the wood-stave pipe had deteriorated to such an extent, causing great leakage of water, that replacement became necessary. Thereupon a portion of the flow lines were replaced with castiron pipe. The replacement program, so far as carried out, was financed by general obligation bonds of the city, which have all been paid, and the city is now free from debt. The annual gross revenue from the water system was about $1,500, with operating costs approximately $800, leaving a net annual revenue of about $700 which was diverted to the general fund of the city and used to pay current expenses. Because of the leaky condition of the remainder of the wood-stave pipe causing a loss of about 50 per cent of the water taken into the system, the city desired to continue its replacement program and make other improvements in its water system. A comprehensive survey and estimate was made by competent engineers, and their report was adopted by the city council. Therein it was shown that $30,584.35 was necessary in order to rehabilitate the system. While the city is free from debt, yet a borrowing in this amount, and issue of general obligation bonds therefor, which is in excess of the revenue for the year, would exceed the debt limit imposed by section 4, art. 14, of the Constitution. The city proposes to finance the project by a loan from the federal government under the terms of the National Industrial Recovery Act (section 203 [40 USCA § 403]), which allows a grant by the government of 30 per cent of the cost of the labor and materials used on the work. An ordinance was thereupon, on August 28, 1933, passed by the city council authorizing the issuance of $22,000 of "Revenue Bonds," the principal and interest of which are payable over a period of 30 years solely out of a portion of

the net revenues derived from the operation of the waterworks system. For its authority to pass the ordinance and issue the revenue bonds, the city relies on Laws of Utah 1933, c. 22 (2d Special Session) p. 41, commonly known as the Granger Act, and hereafter referred to as the act. The ordinance provides that 80 per cent of such net revenues, set at $1,500 a year, over a period of 30 years, shall be pledged to pay principal and interest on the revenue bonds. Such allocation is based on the appraised value of the betterments and improvements which are found and declared to be $47,950 as against an appraised value of $11,950 for the present system. It is further ordered and provided that the net revenues so apportioned and allocated to the payment of revenue bonds and coupons "shall be deemed to be revenues derived solely from the said improvements and betterments contemplated herein." The appraisement so found and declared is based on personal knowledge and investigation by the city council and the report of the engineers. It includes an item of $18,000 in the appraisement of betterments and improvements based on the appraised value of one-half a second foot of water to be saved from waste by the proposed rehabilitation of the service. The entire bond issue is to be paid within 30 years of date of issue. The first installment of principal of $400 becomes due in 1936 and the balance in equal installments of $800 each year for 27 years. Other provisions of the ordinance are that the city shall pay into the waterworks fund the reasonable value of all water used by it; that the fiscal year for the purpose of paying the revenue bonds shall be October 1st of one calendar year to September 30th of the succeeding year; that there shall be maintained a special account to be known as the waterworks fund, into which shall be paid all money received from sale of water; that the reasonable cost of operation and maintenance of the system is made a first lien upon the total revenues of the system; allotments for extensions and betterments and reserve for depreciation and repairs shall be set aside in a sinking fund;

that the principal of and interest on the revenue bonds shall be paid from 80 per cent of the net revenues; a sinking fund to be set up out of the accumulated balance which may be disposed of by the city council as it sees fit, provided sufficient shall be kept in the sinking fund at all times to pay principal and interest on the bonds for the next ensuing year. All of the contemplated revenue is set out and allocated in an amortization table incorporated in the ordinance. / The water rates are fixed by the ordinance on a somewhat higher schedule than hertofore, and the city council is required to maintain such rates or revise the same in order to provide sufficient net revenues to meet the revenue bond obligations. The city council is authorized to apply to the United States government through its proper officer for $35,548,35, including the grant of 30 per cent of the cost of labor and materials, and to sell the $22,000 issue of revenue bonds to the government in connection therewith.

The objections urged by plaintiffs to the issue of these bonds and the proceedings leading thereto are these: That the issue creates a "debt" of the city in violation of article 14, §§ 3 and 4, of the Constitution; that the budget requirements of section 15-11-1, Rev. Stats. Utah 1933, were not followed; that no provision is made for the levy of annual taxes to pay the bonds as required by section 15-7-9, Rev. Stats. Utah 1933; that the segregation and allocation of net revenues is arbitrary, illegal, and void; that the bonds are not payable in equal installments as required by the act of 1933; that the fixing of the fiscal year violates article 13, § 1, of the Constitution; and that the requirement of payment by the city for water used by it is illegal as creating a "debt."

Two decisive general questions are involved in this proceeding: (1) Are the act and the city ordinance enacted pursuant thereto unconstitutional as authorizing and creating a debt in violation of sections 3 and 4, art. 14, of the state Constitution? and (2) Do the city ordinance and other

proceedings taken by the city, on which the issue of revenue bonds is taken, comply with the requirements of the act?

The Constitution, art. 14, § 3, provides that:

"No debt in excess of the taxes for the current year shall be created by any * * * city * * * unless the proposition to create such debt" shall be submitted to, and approved by, a majority of the qualified taxpaying electors. Section 4 limits the indebtedness of a city of the third class, when so authorized, to not to exceed 4 per cent of the value of the taxable property therein, for general purposes, and not to exceed an additional 8 per cent to supply such city with water, artificial lights, or sewers, when the works for supplying such services "shall be owned and controlled by the municipality."

In the case of *Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878, this court held these constitutional provisions not violated where the city undertook to purchase electric generating equipment and pay for same exclusively out of the proceeds earned thereby. In *Fjeldsted* v. *Ogden City*, 28 P. (2d) 144, the court decided that, notwithstanding the decision in the *Barnes* v. *Lehi City* Case, a city would become indebted in the constitutional sense where it undertook to issue revenue bonds, the principal and interest of which are payable out of future earnings of an existing waterworks system, yielding a substantial revenue to the city.

We have extended our discussion of these questions farther than necessary to decide the issues raised in the instant case, but we have done so for the reason that other cities of the state, including Ogden City, are desirous of an interpretation of the recently adopted constitutional amendment and legislative act, in order to know within what limitations they may obtain funds from the national government. We still adhere to the position taken in the case of *Fjeldsted* v. *Ogden City*. The proceedings which formed the basis of our decision in that case were initiated and concluded during the year 1932, and were controlled by the statutes and constitutional provisions then existing. Since that time the situation has been materially changed. On

January 1, 1933, there became effective an amendment to article 11, § 5, of the state Constitution, relating to municipal corporations herein referred to as the amendment. This amendment had been adopted at the general election held in the November preceding. The proposal for amendment contained a section providing that, if adopted, it should become effective January 1, 1933. Ordinarily, a constitutional amendment becomes part of the Constitution upon adoption. Not anything in this case requires decision as to when this amendment became operative, so we shall assume it was effective January 1, 1933. On August 8, 1933, there became effective chapter 22, Laws of Utah 1933, Second Special Session, called the Granger Act, herein referred to as the act. The proceedings for the issuance of revenue bonds by the city purport to have been initiated and proceeded with under and pursuant to the authority of the act. All such proceedings were had after that act became effective.

The act of 1933, providing for the issuance and sale of revenue bonds, on which the city depends for the validity of its action, is entitled "Industrial Recovery—Public Projects or Service." An analysis of the act by sections follows:

Section 1 provides that any county, city, or incorporated town in this state may purchase or construct a waterworks system, water supply system, sewer system, sanitary disposal equipment, and appliances, ice plant, gas or electric plants, and distribution systems, hospitals, toll bridges, slaughter houses, and any other public project or service which may be lawfully owned, operated, or managed by such corporations, including any public works or improvements named in the National Industrial Recovery Act, and that any such public corporation "operating any such project or service may improve, enlarge, extend or repair the same, as in this act provided."

Section 2 provides the act is a cumulative statutory authority for the purposes named; the intent being to create

an additional and alternate statutory method for the purposes indicated.

Section 3: When the governing body of any of the mentioned public corporations, by at least two-thirds vote, shall determine to proceed under the act to purchase or construct any project or utility, it must cause a comprehensive estimate to be made of the cost thereof by a competent engineer, and by ordinance provide for the issuance of revenue bonds; that the principal of the bonds shall be payable in equal annual installments beginning not later than 3 years after date of issue and payable not exceeding 35 years from date, bear not to exceed 6 per cent per annum interest, and may be sold at either public or private sale, but shall not be sold on a basis to yield more than 6 per cent per annum to date of average maturity; that, when sold to other than some agency of the United States government, the bonds must be sold after advertisement; that principal of and interest upon such bonds shall be payable solely from the net revenues derived from the operation of the project or service for the purchase or construction of which they are issued, "provided, however, that bonds issued under this act to improve, enlarge, extend or repair an existing county or municipally owned project or service may be made payable solely from the net revenues of such improvement, extensions or repairs as hereinafter provided." The principal and interest of the bonds shall not be a charge upon the tax revenues of such county, city, or incorporated town, and each bond and coupon must plainly state on its face that it is issued under the provisions of the act, and does not constitute an indebtedness within any constitutional provision or statutory limitation; that "no bond or coupon issued pursuant to this act shall constitute an indebtedness of such county, city or incorporated town within the meaning of any state constitutional provision or statutory limitation."

Sections 4, 5 and 6 refer to details as to execution of the bonds and application of proceeds. Section 7 provides that the reasonable cost and value of any service rendered to it

may be charged against the county, city, or town, and paid periodically as it accrues. Sections 8 and 9 authorize additional bonds and the issuing of refunding bonds.

Section 10 refers to rates to be charged for services furnished by the project or service which shall be reasonable and uniform in respect to class, and must be sufficient to provide for payment of principal and interest on the bonds issued, pay the expense of operation and maintenance of the plant or project, provide for depreciation and a reserve for improvements, betterments, and extensions, and create a sinking fund. Such rates may be fixed preceding issuance of bonds and may be revised from time to time by the governing body of the corporation.

Section 11: The holder of the bonds may enforce performance of obligations created thereby.

Section 12: The cost of operating and maintaining the project and expense of betterments or replacements to keep it in good repair are made a first lien and charge upon the revenues or income to be derived from its operation.

Section 13 outlines the procedure to be followed in adopting a bond ordinance and provides a referendum by the people of the municipality if within 21 days a petition signed by 15 per cent of the voters is filed requesting such election.

Section 14: "Whenever any county, city or incorporated town now or hereafter owning and operating a project or service as described in Section 1 hereof, whether constructed under the provisions of this act or not, shall desire to construct improvements and betterments thereto, it may issue revenue bonds under the provisions of this act to pay for same, and the procedure therefor including the fixing of rates and the computation of the amounts thereof shall be the same as in this act provided for the issuance of bonds for the purchase or construction of such a project or service in a county, city or incorporated town which has not theretofore owned and operated such a project or service; provided, however, that in the ordinance or other legislative enactment declaring the intention for issuing the bonds and providing details in connection therewith, the governing body of the county, city or incorporated town, as the case may be, may provide, find and declare, in addition to the other requirements set out in the statute, the value of the then existing project or service and

the value of the betterments or improvements proposed to be constructed, and the revenue derived from the entire project or service, when the contemplated betterments and improvements are completed, may then be divided according to such values and so much of the revenue as is in proportion to the value of such betterments and improvements as against the value of the previous existing projects or service as so determined, be set aside and used first and to such extent as may be necessary for the purpose of paying the revenue bonds issued for such betterments or improvements, and providing a sinking fund and reserve to discharge the same, or such governing body may determine such other proper method of division of the revenues of the completed system, plant or project between the previously existing system, plant or project, and the entire system, plant or project when the contemplated betterments and improvements are completed, as the circumstances may require and set aside that portion so determined as derived from the said betterments or improvements for the purpose of paying off such bonds and for such sinking fund and reserve, and such revenue shall be deemed to be income derived exclusively from the betterments and improvements. Nothing herein contained shall be deemed to limit the power of any such municipal corporation to pledge or apply other revenues derived from such project or utility to the retirement of such bonds or the provision of such sinking fund or reserve to such extent as they may lawfully so do."

Section 15: For the purposes of the act the fiscal year may begin on the 1st or 15th of any month of the calendar year.

Section 16: Rates to be charged for service furnished any project mentioned are not subject to control by any state board or commission except where services are rendered without the boundaries of such municipality, and not then in case of waterworks systems.

Sections 17, 18, and 19 cover reports, contents of ordinances, and other details. Section 20 calls for a liberal construction of the act. Section 21: The invalidity of any sentence, section, or clause shall not affect the validity of the remainder of the act.

Section 22 states the purpose to permit counties, cities, and incorporated towns to obtain loans from the federal emergency administration of public works for the purchase, construction, improvement, enlargement, extension, or repair

of any of the projects named in section 1; declares that an emergency exists and that the act shall be effective on passage and approval.

Section 23: The act to cease to be effective, except to complete projects entered into under its provisions, at the expiration of two years from the date of enactment, or sooner if the Governor by proclamation shall so declare.

The constitutional amendment of 1933 is twofold. It reiterates, without change, the subject-matter theretofore contained in section 5 of art. 11, as follows: "Corporations for municipal purposes shall not be created by special laws. The legislature by general laws shall provide for the incorporation, organization and classification of cities and towns in proportion to population, which laws may be altered, amended or repealed."

The new matter follows as part of the same section: "Any incorporated city or town may frame and adopt a charter for its own government in the following manner."

Then follows a statement of the procedure to be followed by any city desiring to make and adopt a charter for its own government. There is then an enumeration of powers to be granted to cities as follows:

"*Each city forming its charter under this section* shall have, and is hereby granted, the authority to exercise *all powers relating to municipal affairs,* and to adopt and enforce within its limits, local police, sanitary and similar regulations not in conflict with the general law, and no enumeration of *powers in this constitution* or any law shall be deemed to limit or restrict the general grant of authority hereby conferred. * * *

"The power to be conferred upon the cities by this section shall include the following:

"(a) To levy, assess, and collect taxes and *borrow money,* within the limits *prescribed by general law,* and to levy and collect special assessments for benefits conferred.

"(b) To furnish all local public services, to purchase, hire, construct, own, maintain or operate, or lease, public utilities local in extent and use; to acquire by condemnation, or otherwise, within or without the corporate limits, property necessary for any such pur-

poses, subject to restrictions imposed by general law for the protection of other communities. * * *

"(d) To issue and *sell bonds on the security* * * * *of any public utility owned by the city, or of the revenues thereof, or both,* including, in the case of public utility, a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate." (Italics added.)

Plaintiffs contend the grant of power to cities contained in the amendment is limited to, and may be exercised by, only such cities as adopt a charter in pursuance of the amendment, and that the provisions of the amendment cannot affect the rights of defendant city which operates under powers granted by the Legislature and that the amendment furnishes no basis for the enactment of the act. Defendants contend the constitutional amendment is "a specific grant of authority permitting the proposed revenue bond issue regardless of the fact that no charter has been adopted," and that the powers therein enumerated are applicable alike to all cities of the state whether they have adopted a charter or not. We view the matter in a somewhat different aspect than that presented by either party.

To understand the meaning and effect of the constitutional amendment, we shall review some of the fundamental principles which are controlling. When an act of Legislature is attacked on the ground of constitutionality, the question presented is, not whether it is possible to condemn the act, but whether it is possible to uphold it. The presumption is in favor of validity, and it must be sustained unless it is clearly in violation of fundamental law. *State* v. *Packer Corporation,* 77 Utah 500, 297 P. 1013; *Utah State Fair Ass'n* v. *Green,* 68 Utah 251, 249 P. 1016. To determine whether the act was or was not enacted within legislative power, it is necessary to look to the Constitution as it stood after amendment. The different sections, provisions, and amendments relating to the same subject-matter must be construed together and read in the light of each other, as far as possible, to effect a harmonious construction

of the whole. At the same time full force and effect must be given every provision where this can be done. 12 C. J. 708. A clause in an amendment will prevail over a provision of the original instrument inconsistent with it, but the amendment should not be construed as affecting any greater innovation of the existing Constitution than is reasonably necessary to accomplish the purposes of its adoption. 12 C. J. 710.

Ordinarily, state Constitutions are limitations on the legislative power, and are not grants of power to the Legislature. *Salt Lake City* v. *Christensen Co.*, 34 Utah 38, 95 P. 523, 17 L. R. A. (N. S.) 898. See, also, *O'Connell* v. *State Board of Equalization* (Mont.) 25 P. (2d) 114. In the absence of constitutional limitation or restriction, the Legislature of the state has plenary power to create municipal corporations and confer on them large or restricted powers according to its will. Cities are in their nature and purposes instrumentalities for the convenient administration of government. This view is well expressed in 1 Dillon on Municipal Corporations (5th Ed.) p. 154, as follows:

"It must now be conceded that the great weight of authority denies in toto the existence, in the absence of special constitutional provisions, of any inherent right of local self-government which is beyond legislative control. The Supreme Court of the United States has declared that a municipal corporation in the exercise of all its duties, including those most strictly local or internal, is but a department of the State. The legislature may give it all the powers such a being is capable of receiving, making it a miniature State within its locality; or it may strip it of every power, leaving it a corporation in name only; and it may create and recreate these changes as often as it chooses, or it may itself exercise directly within the locality any or all the powers usually committed to a municipality. So viewed, its acts cannot be regarded as sometimes those of an agency of the State and at others those of a municipality; but, its character and nature remaining at all times the same, it is great or small according as the legislature shall extend or contract the sphere of its action. Hence, the manner in which this legislative authority is given effect for purposes of local government is immaterial."

And from page 181, same volume, as follows:

"The supremacy of the legislative authority over municipal corporations is not, however, in all respects, unlimited; but the limitations must be sought either in the national or State Constitution; and except as there found, in terms or by fair implication, they do not exist. In England it is settled that the Crown has no power, without the consent of those to be affected thereby, to alter or abolish municipal charters or to impose new ones on the corporation. But Parliament may create new corporations, or abolish or alter charters, or impose new ones, at its will, and without the consent of the inhabitants. And so may the State legislatures in this country, if there be no constitutional restriction upon the power." 1 McQuillan on Municipal Corpns. (2d) Ed.) 904; 43 C. J. 176; *Park* v. *City of Duluth*, 134 Minn. 296, 159 N. W. 627.

The decisions of this court are in harmony with these principles. *Salt Lake County* v. *Salt Lake City*, 42 Utah 548, 134 P. 560; *Salt Lake City* v. *Bennion Gas & Oil Co.* (Utah) 15 P. (2d) 648; *American Fork City* v. *Robinson*, 77 Utah 168, 292 P. 249; *Salt Lake City* v. *Sutter*, 61 Utah 533, 216 P. 234. In the latter case it was expressly held that under article 11, § 5, of the state Constitution, providing that the Legislature shall provide for the incorporation, organization, and classification of cities and towns, the power or authority which a municipality possesses in this state is derived from the Legislature.

The purpose of article 11, § 5, as originally adopted, was not to confer power on the Legislature to incorporate, organize, or classify cities or towns, a power which it would possess in the absence of constitutional restriction, but to place a limitation on the manner in which this might be done. The Legislature could no longer grant charters to municipalities by special act, but was required to provide for the incorporation, organization, and classification according to population of all cities by general law.

The constitutional amendment of 1933 provides a new method by which cities may acquire charters, that is, any incorporated city or town may frame and adopt a charter for its own government by proceeding in the manner outlined

in the amendment. The proposed charter, on approval by a majority of the electors of the city voting thereon, thereby becomes "an organic law of such city at such time as may be fixed therein, and shall supersede any existing charter and all laws affecting the organization and government of such city which are now in conflict therewith." Each city forming a charter under the amendment is directly granted the broad powers heretofore referred to, which include the powers enumerated but, says the Constitution, this enumeration is not to be construed a limitation. The enumerated "powers' in this constitution" include the right "to issue and sell bonds on the security of any  *  *  *  public utility owned by the city, or of the revenues thereof, or both." This enumeration is introduced by the language, "The power *to be conferred* upon the cities *by this section* shall include the following." It will be noted that the language is, "The power to be conferred  *  *  *  by this section," and not, "The power to be conferred on cities forming their own charters under this section."

It is generally held in states where, by constitutional provision, cities are authorized to form their own charters, that the power thus conferred is a ligislative one, and, unless otherwise expressly provided in the Constitution, the city forming its charter has no more or other power in that respect than the Legislature had and could exercise with respect to all municipal corporations. In other words, the Constitution merely transfers from the Legislature to the cities, availing themselves of the opportunity, the right and power to formulate and adopt a charter, which, in all respects, within the power granted, is equivalent to and of the same force and effect within the city as a general law of the Legislature embracing the same provisions would be in noncharter cities. *Morrow* v. *Kansas City,* 186 Mo. 675, 85 S. W. 572; *Sheehan* v. *Scott,* 145 Cal. 684, 79 P. 350. The language of the constitutional amendment, of course, must be construed to mean that at least as to cities adopting their own charters the powers enumerated are available to and may be

exercised by them in such manner as may be indicated in the charter. The legislative body of a charter city may be limited by the charter provisions which the electors of the city adopt. *John Rapp & Son* v. *Kiel,* 159 Cal. 702, 115 P. 651; *In re Pfahler,* 150 Cal. 71, 88 P. 270, 11 L. R. A. (N. S.) 1092, 11 Ann. Cas. 911; *People* v. *Newman,* 96 Cal. 605, 31 P. 564. Such charter is the constitution of the chartered city giving to its legislative body the power it is to exercise or fixing limitations on the exercise of power as the case may be. *Platt* v. *City and County of San Francisco,* 158 Cal. 74, 110 P. 304; *Ruth* v. *Oklahoma City,* 143 Okl. 62, 266, 287 P. 406; *Standard Oil Co.* v. *City of Lincoln,* 114 Neb. 243, 207 N. W. 172, 208 P. 962; *Columbus Gas & Fuel Co.* v. *City of Columbus, Ohio* (C. C. A.) 43 F. (2d) 379. In *Village of Perrysburg* v. *Ridgway,* 108 Ohio St. 245, 140 N. E. 595, 597, the court, in construing the provisions of the Ohio Constitution which contains a more definite grant of power than our 1933 amendment, held it was self-executing in the sense that chartered cities obtained their grant directly from the Constitution and not from any legislative act. The court said:

"But what is a city charter but a city constitution, and a city constitution can in no wise enlarge the municipal power granted in the state Constitution. After all, it only distributes that power to the different agencies of government, and in that distribution may place such limitation, but not enlargement, upon that power, as the people of the municipality may see fit in such charter or constitution."

However, there are no cities in this state which have elected to formulate and adopt their own charters. All the cities, including Santaquin, are organized and operate under and pursuant to general law. The question then is, Are the powers enumerated in the amendment equally available to cities operating under legislative enactment? The answer, we think, must be in the affirmative, at least to the extent that the Legislature has conferred any such powers on the cities. The power directly conferred on cities forming and adopting their own charters is plenary with relation to "municipal affairs." The acquisition and opera-

tion of a waterworks system is a municipal affair. *Wehrle* v. *Board of Water Commissioners*, 211 Cal. 70, 293 P. 67. The reservoir of power is the same, and we can perceive of no reason to distinguish between a charter adopted by the people of a city and one enacted by general law of the Legislature based merely on the origin of the legislation.

Since the only basis for classification of cities, as fixed by the Constitution, is population, there would seem to be no good reason for denying to the Legislature the right to confer the same powers on cities not adopting a charter as are granted to cities of the same class with a charter. The Constitution does not make such a distinction, and the courts cannot.

The power granted by the constitional provision to chartered cities is no greater than that possessed by the Legislature and which it may, if it sees fit, confer on unchartered municipalities by general law. The difference is that, when a city adopts its charter pursuant to the amendment, then the powers which it may exercise are directly conferred by the Constitution, and may not be controlled by the Legislature except as to those matters and things reserved to the Legislature by the Constitution. *Shook* v. *Mahoning Valley Sanitary Dist.*, 120 Ohio St. 449, 166 N. E. 415. The power granted in the amendment to cities forming their own charters, while taking such cities out of the orbit of legislative action as to municipal and local affairs, is no limitation on the power of the Legislature with respect to the organization of other cities and the conferring of power on them by general law. We think the enumeration of the power to borrow money on the security of a utility or its income, or both, was intended by the people in adopting the constitutional amendment to place such power within the scope of municipal action, and was clearly intended to be available to chartered cities in forming their own charters, and in addition thereto by use of the language, "power to be conferred upon the cities by this section," just as clearly was it intended to enumerate a power which the Legislature

might, if it chose, confer on cities depending on general law for their organization and authority. It is an expression by the people of the scope of municipal action when permitted by legislative enactment or included in any charter adopted by the people of a city.

The amendment is of equal dignity with the provisions in article 14, §§ 3 and 4. These provisions must be read and construed with relation to each other so as to give meaning to each. The powers enumerated in the amendment must be given full significance and force as intending to grant, subject to acceptance or limitation by charter, or delegation by legislative act, the power to borrow money on the security of a utility or its income. It is an addition to the other provision relative to the limitation of municipal indebtedness.

Section 3 of article 14 is no restraint on the city as such, but is a limitation on the power of the city commission with respect to incurring any debt in excess of the revenues of the current year without authorization by ▮▮▮ vote of the electors. Section 4 of article 14, however, places limits beyond which the electors may not authorize an indebtedness. It is a limitation on the power of the corporation itself. The amendment does not refer to powers which may be exercised by boards of commissioners, but enumerates powers which may be exercised by incorporated cities. In order to give the amendment full force and effect, when construed in connection with the other provisions of the Constitution, it can fairly and logically apply as an enlargement of the limitations placed on cities by section 4, and not as modifying in any degree the requirements of section 3. There is not anything in the amendment which conflicts with section 3. The Constitution as now amended prohibits a city from creating any debt in excess of the taxes of the current year, unless authorized so to do by a vote of the qualified electors of such city who have paid a property tax therein. Nowhere in the Constitution is a debt defined. The same kind of an obligation which was a debt

prior to the adoption of the amendment is still a debt after the amendment took effect. The amendment enlarged the scope of the borrowing power by a city. By section 4 of article 14 a city is limited in its borrowing power to the per centum of the value of the taxable property within the city, but by the amendment a city may, in addition thereto, issue and sell bonds on the security of certain of the public utilities owned by it, or the revenue thereof, or both. Thus, while the amendment in no way affected section 3 of article 14, it did extend the limit of indebtedness provided for in section 4 of article 14. A city of the third class, such as Santaquin, may now incur a general obligation of 4 per centum of the value of its taxable property, an obligation of 8 per centum for the purpose of supplying the city with water, artificial light and sewer, and, in addition thereto, when authorized by the Legislature, may borrow such additional sums as it may be able to borrow on the security of certain of the public utilities which may be owned by it, or the revenues derived therefrom. It seems clear that the city may not, by reason of the amendment, borrow money on the security of its water rights or waterworks system in light of those provisions of article 11, § 6, of our state Constitution, which prohibit municipal corporations from directly or indirectly leasing, selling, alienating, or disposing of waterworks, water rights, or sources of water supply now or hereafter to be owned or controlled by it. As the city does not propose to place a lien upon its waterworks or water rights, but only on the net revenue to be derived therefrom, we need not discuss or decide that question. That the provisions of the amendment were intended to make it possible for cities to issue and sell bonds on the security of revenue derived from its waterworks is clear, and there is no provision in the Constitution which is in conflict with the amendment in such respect. The issuance and sale of revenue bonds in the amount, and payable in the manner, proposed by the city, is within constitutional limitations. It does not follow, however, that the bonds are legal obligations merely

because within such limitations. Their issuance must be authorized by vote of the taxpaying electors so far as it is proposed to pay the same by pledge of any revenue resulting from the water system now owned by the city. This has not been done.

Much stress is put on the fact that these revenue bonds are payable from a separate fund to be fed by income to be earned through thirty years. Recent history has shown that all too frequently anticipated revenues do not come up to expectation because of the shifting conditions which affect community life. Nevertheless, the bonds must be paid when due, or city credit will be impaired. With noiseless foot but steady tread the day of reckoning inevitably comes to demand its toll. To a city, no less than to a state or individual, untarnished credit and an honored name are of inestimable worth. No wealth or power which may come to a community is of more lasting importance than the good name it maintains by keeping its faith unbroken in meeting all its engagements and obligations. In spite of the fact that full faith and credit of the city is not pledged to the payment of revenue bonds, no prudent city will permit its promise to pay to go unfulfilled where it has received and enjoyed the fruits of the obligation. These facts but illustrate and emphasize the wisdom of the people in writing into their Constitution the requirement that debts whch cannot be paid from revenues of the current year must find authorization in a favorable majority vote of the qualified electors who also are taxpayers.

In *Fjeldsted* v. *Ogden City* this court held the pledging of future revenue of a presently owned waterworks system was no different from the pledging of future revenues derived from taxation, and that in either event the obligation was a debt which can be created only by authorization by a vote of the taxpaying electors. This holding was bottomed on two factors: (1) That the revenues now earned and to be earned by a utility which the city owns is property of the city, which, if diverted to pay bonds, would burden the

taxpayers to the extent of the property or income so diverted or pledged; and (2) that under previous decisions of this court other revenues of a city, including income from waterworks and lighting systems, are of the same class as tax revenues, within contemplation of section 3 of article 14 of the Constitution. In *Scott* v. *Salt Lake County*, 58 Utah 25, 196 P. 1022, 1023, it was said:

"That the word 'taxes' in the above-quoted provision of the Constitution means all revenue, including that which is uncollected, is no longer a debatable question in this state. In *Muir* v. *Murray City* [55 Utah 368], 186 P. 433, it is said:

" 'Notwithstanding the section of the Constitution above quoted uses the word "taxes" instead of the word "revenue," we are inclined to the view that the word "revenue" conveys the meaning intended. It is hardly possible to conceive that the members of the constitutional convention intended anything other than that the city, in creating an indebtedness without submitting it to the electorate, should keep within the revenue of the current year. Many reasons exist in favor of such an interpretation, and, so far as we can see, there are none against it.' "

In *Dickinson* v. *Salt Lake City*, 57 Utah 530, 195 P. 1110, 1111, the court said:

"The evident purpose of the Constitution makers, expressed in section 3 of article 14, is that municipalities shall keep within the year's income in the operation of their business; in other words, 'pay as they go,' and not incur any indebtedness outside of the current taxes and other revenue of that year."

When the constitutional language has been so construed for the purpose of those cases, it would be highly inconsistent to place a different construction on the same language in this or the Ogden Case.

Under article 11, § 6, of the Constitution a waterworks system of the city must be "preserved" maintained and operated by it for supplying its inhabitants with water at reasonable charges," and the city is forbidden to directly or indirectly, "lease, sell, alien or dispose of any waterworks, water rights, or sources of water supply." The primary purpose or intent of this provision was to

preserve to the inhabitants of the cities a supply of water at reasonable rates, and incidentally to secure to the taxpayers any benefit or profit that might arise from the operation of such utility. A reasonable rate may be sufficiently high to yield a reasonable profit. *Twitchell* v. *City of Spokane,* 55 Wash. 86, 104 P. 150, 24 L. R. A. (N. S.) 290, 133 Am. St. Rep. 1021. The net revenue arising from the operation of a waterworks system or other utility is a resource which belongs to the city and which the taxpayers are entitled to have considered in the fixing of the tax rate for the purpose of reducing the levy. *In re Bliss,* 142 Okl. 1, 285 P. 73; *In re Tax Levies of City of Woodward,* 143 Okl. 204, 288 P. 485; *Crouch* v. *City of McKinney,* 47 Tex. Civ. App. 54, 104 S. W. 518; *Twitchell* v. *City of Spokane,* supra.

The special fund doctrine had its rise in analogy to funds created by special assessment for public improvements. *Winston* v. *City of Spokane,* 12 Wash. 524, 41 P. 888. The distinction, however, is clear. In case of special assessments, the moneys collected and placed in the special fund is a trust fund which is not owned by the city, and no part of it could be used by the city to pay current expenses. On the other hand, net revenues derived from the operation of a utility belong to the city and may be used for any corporate purpose.

The waterworks system of Santaquin City was purchased out of tax revenues and belongs to the city. Its taxpaying citizens have a direct pecuniary and beneficial interest in the maintenance and operation of the system, and are entitled to be relieved of taxation to the extent of any profits which may accrue thereby. When all or part of the net revenues from the system are diverted to a special fund to pay bonds issued for any purpose, a burden is thereby cast on the taxpayers to the extent of such diversion. Undoubtedly any waterworks revenue already collected, or which may be reasonably anticipated to be collected in any year, is subject to be expended for any lawful purpose by the city commission in its discretion, but, when future revenue is

pledged to pay a presently created obligation, it is the same as pledging revenue of the city which it may obtain by taxation or otherwise in future years. When an obligation is voluntarily created which cannot be paid out of money in the treasury, or which may be reasonably anticipated to accrue from taxes or other resources of the city for the current year, it is such an obligation as can be authorized, not by board of commissioners, but only by a majority vote of the taxpaying electors of the city. The language of Judge Dillon in 1 Dillon on Municipal Corpns. (5th Ed.) p. 411, is peculiarly appropriate, wherein he says:

"The purpose of these constitutional provisions is *to limit the expenditures in any given year* to the amount of the revenues and income of the municipality provided for such year, unless the voters enlarge the limit. Each year's income and revenue must pay each year's indebtedness and liability, and no indebtedness or liability incurred in any one year shall be paid out of the income or revenue of any future year."

The recent holding of the Alabama Supreme Court under similar constitutional provisions to those of article 14, §§ 3 and 4, of our Constitution, furnish support for our conclusions. *In re Opinion of the Justices*, 226 Ala. 570, 148 So. 111.

The rule is well established that a city organized and operating under general law may possess and exercise only the powers granted in express words and such as are necessarily or fairly implied in, or incident to, the powers expressly granted, or those essential to the declared objects and purposes of the corporation not merely convenient but indispensable. *Ogden City* v. *Bear Lake & River Water-Works Irr. Co.*, 16 Utah 440, 52 P. 697, 41 L. R. A. 305; *Salt Lake City* v. *Sutter*, supra; 1 McQuillin Municipal Corpns. (2d Ed.) § 367, p. 910.

It is urged that all cities of the state have and may exercise all the powers referred to in the enumeration of powers in the amendment to the Constitution even beyond that

which is granted by legislative act. We think this contention cannot be sustained. If it be true, as we ▇ think it is, that people of a city in forming a charter may restrict its legislative body, or refuse or fail to confer by charter all the powers which by the Constitution may be conferred, and if legislative cities have only the powers expressly conferred and those necessarily implied, then the city must look either to its charter where such charter is one adopted by it, or to the legislative enactments to determine the nature and extent of powers to be exercised by its legislative body or other officers. This must be so, unless the constitutional language is such as to be self-executing, thereby conferring powers directly on the legislative body of the city. The amendment is not such a grant of power.

Where a power is conferred on municipalities, the method of exercising such power is, in absence of restriction, usually within municipal discretion, but, where the method of its exercise is prescribed, such method constitutes the measure of the power. 1 McQuillan, Municipal Corpns. (2d Ed.) § 386, p. 956; *Consumers' Coal Co.* v. *City of Lincoln*, 109 Neb. 51, 189 N. W. 643. In this state the power of cities to purchase, construct, extend, improve, repair, maintain, and operate certain public utilities and other projects, including waterworks systems, is recognized or expressly granted in the Constitution and several statutes. Constitution, art. 11, § 6; art. 14, § 4; Revised Statutes Utah 1933, 15-7-4, 15-7-5, 15-8-14, 15-8-15; Laws of Utah 1933 (Second Special Session) ch. 22, § 1, p. 41. So, also, several methods are prescribed by which waterworks systems, or additions thereto, may be acquired. They may be paid for out of current funds, Rev. Stats. Utah 1933, 15-8-2, 15-8-87; or by the issue of general obligation bonds, Constitution, art. 14, § 4; Rev. Stats. Utah 1933, 15-7-7, 15-7-8, 15-7-9, or by the levy of special or local taxes on property benefited thereby, Rev. Stats. Utah 1933, 15-7-46, or by the issue of revenue bonds in the manner prescribed in Laws of Utah 1933 (Second Special Session) c. 22, § 3, p. 42. The

city has chosen to proceed in pursuance of the provisions of the act of 1933. The act by its terms grants power to municipalities to borrow money and issue bonds on the security of the income to be derived from the operation of public utilities or other projects, including waterworks systems, which it may purchase or construct, and, where such municipalities are the owners of any such project, to borrow money and issue bonds on the security of the net revenues derived from any improvements, extensions, or repairs to such project. While the act does not expressly grant power to borrow money on the security of revenue produced from the operation of a system or project now owned by a municipality, the spirit and purpose expressed therein would indicate that this was intended. The act confers upon cities (for the period therein specified) the authority to issue and sell bonds which are to be paid for solely from the net revenue derived from their waterworks systems and other public utilities owned and controlled by cities. It is one of a number of emergency measures passed by the Legislature during its special session. The evident purpose of the Legislature was to confer upon the cities of this state; during the existence of the emergency, all of the powers that could lawfully be conferred upon them to construct, improve, and repair waterworks and the other public utilities mentioned in the act so that the prevailing unemployment might be relieved. It is also apparent that the Legislature intended by the act to make it possible for cities to take advantage of the liberal provisions of the National Recovery Act with respect to borrowing money for constructing and improving self-liquidating projects. The act (Laws Utah 1933, 2d Sp. Sess., c. 22) contains, among others, the following provisions:

Section 1: "That any * * * city * * * in the state of Utah may purchase or construct a waterworks system, water supply system, sewer system, sanitary disposal equipment and appliances, ice plant, gas or electric plants and/or distributing systems, hospitals, toll bridges, slaughter houses, and any other public project or service which may lawfully be owned and operated or managed by such * * * cities * * * and including any public works or improvements

named in the National Industrial Recovery Act, as an object upon which the moneys appropriated under such act may be expended or loaned, either within or without the limits of such * * * city * * * now or hereafter owning and operating any such project or service may improve, enlarge, extend or repair the same, as in this act provided."

Section 2: "This act shall be construed as a cumulative statutory authority for the purposes herein named and shall not be construed to repeal any existing laws with respect thereto, it being the purpose and intent of this act to create an additional and alternate statutory method for the purposes herein named."

Section 14 of the act outlines the procedure that may be followed for ascertaining the amount of bonds that may be issued, and then concludes with the language:

"Nothing herein contained shall be deemed to limit the power of any such municipal corporation to pledge or apply other revenues derived from such project or utility to the retirement of such bonds or the provision of such sinking fund or reserve to such extent as they may lawfully so do."

That the city has authority to improve its waterworks system as proposed in its ordinance is not and cannot be questioned. Nor can there be any doubt that the act grants to cities authority to issue and sell revenue bonds such as those proposed in the instant case in any manner authorized by law. As already stated, however, where revenues owned by the city are pledged, the provisions of article 14, § 3, must be followed. Section 2 of the act provides that it "shall be construed as a cumulative statutory authority for the purposes" named in the act, and "shall not be construed to repeal any existing laws with respect thereto." Provision is made in Rev. Stats. Utah 1933, 15-7-8, for submission to the qualified electors of the proposition of issuing bonds. Such provision will apply to such bonds as the city proposes to issue and sell on the security of the income to be derived from its waterworks system.

Most of the provisions of section 14 of the act seem to indicate that cities are limited to securing the payment of

bonds, such as the city proposes to issue, to such revenues as will be derived from improvements and betterments made from the money derived from the sale of such bonds. The latter part of that section, however, clearly indicates that there shall be no such limitation if such city has other revenues "derived from such project or utility" as may be lawfully used for that purpose. One of the cardinal rules applicable in the construction of a legislative enactment is that effect shall be given, when possible, to each and all of its provisions. If the Legislature intended that cities should be permitted to pledge only such revenues as might be derived from the improvement and betterments of its public utilities to be paid for with the money derived from the sale of bonds, it is impossible to give any meaning or effect to that provision of the section which directs that "nothing herein contained shall be deemed to limit the power of any such municipal corporation to pledge or apply other revenues derived from such project or utility to the retirement of such bonds * * * as they may lawfully so do." If the act be viewed, as it must be, in the light of the purposes sought to be accomplished, its various provisions may be reconciled and effect given to the intention of the Legislature, even though there be some inconsistencies in the language used. Prior to the passage of the act, this court had rendered its decision in the case of *Fjeldsted* v. *Ogden City*. It was held in that case that the proposed bonds, when issued, would constitute a debt within the meaning of the Constitution as it then was, and that Ogden City was without authority to issue and sell bonds secured by the net income derived from its waterworks system because not authorized by vote of the electors, and such bonds, when added to the existing indebtedness of the city, exceeded the constitutional debt limit of the city. The Legislature attempted by its enactment to devise a means whereby a city might, within constitutional limitations, issue and sell its bonds and secure the payment thereof by pledging the net revenues derived from a waterworks system or other public

utility or net revenues derived from improvements of or betterments to such system.

In section 3 of the act it is provided:

"No bond or coupon issued pursuant to this act shall constitute an indebtedness of such * * * city * * * within the meaning of any state constitutional provision or statutory limitation."

It is elementary that the Constitution must be regarded by the courts as fundamental law. The power and duty of ascertaining its meaning is a judicial, and not a legislative, function. 12 C. J. 699. Whether the revenue bonds which may be issued under or pursuant to the act create a debt in violation of constitutional debt limits is for the court to determine. Since we hold the act valid and within the power of the Legislature to enact, it would necessarily follow that the bonds issued pursuant thereto do not create debts in violation of constitutional restrictions of section 4, article 14, when duly authorized by a vote of taxpaying electors required by section 3. The above-quoted statement is therefore no more than a declaration of legislative intent to not exceed its constitutional powers in providing for the issuance of revenue bonds and prescribing the procedure to be followed by cities in issuing such bonds.

The amendment contains a specific limitation on cities in favor of legislative enactment by including in its enumeration of powers to be conferred upon cities by the section the following:

"(a) To levy, assess and collect taxes and borrow money, within the limits prescribed by general law. * * *"

The words "general law" ordinarily mean a law passed by the Legislature which operates throughout the state alike upon all the people or upon all people or objects, subjects, or things as a class. 1 McQuillin, Municipal Corpns. (2d Ed.) 588. How this provision may affect chartered cities need not detain us, since Santaquin is not a char-

tered city, but the obvious intent expressed in the amendment is that the Legislature shall have power to further limit the borrowing powers of cities which are chartered by and obtain their powers from general law. The limitation of time within which the act shall be operative is thus within legislative competency.

Plaintiffs contend that the segregation and allocation of net revenues provided in the ordinance is arbitrary, illegal, and void. The city council, by the ordinance, undertook to provide, find, and declare the value of the then existing project or service, and the value of the betterments or improvements proposed to be constructed, and to divide the income from the improved system in proportion as the appraised value of the old system bears to the betterments and improvements, and to impound the net revenue to be earned from the proposed improvements and betterments in a special fund from which the revenue bonds and interest are to be paid, all pursuant to the provisions of section 14 of the act. Of the water now owned by the city under its water right and carried into its system, it loses one-half a second foot in seepage through defective wood-stave pipes which it is proposed to replace. This one-half second foot of water was appraised by the engineers at $18,000, and that appraisal was approved and adopted by the council, and that item included in the valuation placed on the proposed betterments and improvements. This was done apparently on the theory that such saving of water added the value thereof to the value of the system. It will be noted that in the appraisement of the existing system the value of the water rights owned by the city is not taken into account. We think the action of the city council in including this $18,000 item on the side of betterments and improvements and excluding the value of its water rights from the appraisement of the present system is open to objection that it is arbitrary and unreasonable, and therefore illegal. The city already owns the water. It is water furnished by the system that yields an income. The physical

system without the water would produce no revenue. Estimated future earnings of the improved system must of necessity be based on the value of the pipe system, the water rights used and usable in connection with its operation, and also the betterments and improvements. It is such a full and fair appraisement that is contemplated by the revenue bond act of 1933 as the basis for allocation of revenue. That the proposed allocation of revenue to the city treasury is disproportionate to the true value of the present waterworks system is clearly shown by the record which discloses that the present net waterworks revenue is approximately $700 per year, that the income allocated to the city treasury under the ordinance is only $375, notwithstanding the water rates are to be increased. The only substantial increase in revenue from the improved system will be from increased rates. If the city undertook to acquire an additional one-half second foot of water at a cost of $18,000, that item could undoubtedly be included as a betterment. But that is not the situation before us. The cost of the new pipe and the expense of laying it represent the expenditure made by the city to effect the saving of water now going to waste. That item of cost is already included in the appraisal of "improvements and betterments." These words, as used in the act, cannot well be said to include a water right already owned by the city. The word "betterments" is sometimes used to denote the enhanced value an estate acquires in consequence of improvements or repairs, and, when so used, the measure of value is not necessarily limited to the cost of the improvements or repairs. 7 C. J. 1145; 1 Bouv. Law Dict. 340; *Greer* v. *Fontaine,* 71 Ark. 605, 77 S. W. 56. The word is used in that sense in connection with claims of occupying claimants and in proceedings for the assessment of abutting property for public improvements. Where the word is given its broad meaning, the appraised value of the estate would not include both the cost of the improvements and the enhanced value acquired in consequence thereof. The making of a finding and determination of appraised values in this proceeding is somewhat

analogous to the determination of benefits by city authorities in special assessment proceedings. The general rule in such cases is that such determination is conclusive and not subject to review by the courts unless based on an erroneous view of the law, or that it was demonstrably erroneous, or was arbitrary, corrupt, or fraudulent, or a manifest abuse of legislative discretion. 44 C. J. 589. The exclusion of the value of water rights from the appraised value of the plant and the inclusion of the $18,000 item in the appraised value of betterments was so demonstrably erroneous as to amount to arbitrary action in excess of the discretion of the board of commissioners. A reappraisement of values to conform to these views will result in a different allocation of income to the waterworks fund and to the city treasury, respectively. To afford an opportunity for such correction, the writ of prohibition must be made permanent.

Objection is made that the provision of the ordinance which fixes the fiscal year as from October 1st of one year to September 30th of the next year, during the life of the bonds for the purpose of paying revenue bonds and coupons, is invalid and in violation of article 13, § 1, of the Constitution, which reads:

"The fiscal year shall begin on the first day of January, unless changed by the Legislature."

The act provides that for the purposes of the act the fiscal year of any city in the segregation and application of the revenue and income from any project or service described "may begin on the first or fifteenth day of any month of the calendar year." The action of the Legislature is within the scope of its power, and is not in violation of the Constitution. The ordinance in turn complied with the requirements of the legislative act.

Another objection is that the denomination of the bonds does violence to the act which provides that revenue bonds

shall be payable in equal annual installments, whereas the issue proposed calls for one installment of $400 and all other installments of $800. This is a substantial compliance with the statute. A strictly mathematical adherence to the letter of the statute would require the $22,-000 issue payable over 28 years, as proposed, to be paid in annual installments of $785.7142 plus, a denomination which is wholly impracticable. The statute does not require such nicety where its provisions have been substantially followed.

The objection that there is no requirement in the act that the bonds issued thereunder must be sold at not less than par value is not available to plaintiff, since it is expressly provided in the ordinance that the "bonds shall be sold at not less than the face value thereof," in harmony with the requirements of Rev. Stats. Utah 1933, 15-7-9. The requirements of the act and of the city ordinance that the city must pay into the special waterworks fund the reasonable value of all water used by it are not invalid on the ground it is a contract to pay for service periodically as pointed out in the decision in *Fjeldsted* v. *Ogden City*. However, we are unable to distinguish the value of such service from the revenues produced by the system and devoted to general purposes. Where the city owns its water system and supplies itself without charge with water for city purposes, the taxpayer has been relieved of the burden of payment. It is the equivalent to an addition, in the value thereof, to the net revenue produced by the system. Now, when the value of such service is to be fixed in terms of money and the money paid by the city to the waterworks fund to pay principal of and interest on revenue bonds, the money must come from the general taxpayer. The taxpayers pay for a service rendered by a utility they own. *Hight* v. *City of Harrisonville,* 328 Mo. 549, 41 S. W. (2d) 155.

It is alleged that the budget required by Rev. Stats. Utah 1933, 15-11-1 to 15-11-5, to be adopted by the city for the year 1933, contains no provision covering the revenues and disbursements from or in connection with the construction,

operation, or maintenance of the contemplated improvements and replacements, or the revenue bond issue.

We adhere to the views on this subject expressed in the decision of *Fjeldsted* v. *Ogden City*, supra. The act, authorizing the emergency issue of revenue bonds for the purposes therein set forth, having been passed subsequent to the passage of the budget law, indicates a legislative intent that the issue of such bonds is not subject to the budget law requirements.

In view of the length of this opinion, we make the following summary on the more important issues:

1. The constitutional amendment adopted November 8, 1932, permits the borrowing powers of cities to be enlarged beyond the limitations imposed in article 14, § 4, of the Constitution, to allow the issue of bonds on the security of the revenues derived from its utilities, and on the security of utilities excepting waterworks.

2. A borrowng to be paid out of revenues earned by an existing waterworks system or other utility owned by the city creates a debt in contemplation of article 14, § 3, of the Constitution.

3. The provisions of article 14, § 3, are not modified or repealed by the amendment. Its provisions require a majority vote of the qualified electors of the city who have paid a property tax therein to authorize the creation of a debt in excess of the revenues of the current year.

4. The enactment of the revenue bond act of 1933 was within legislative power, and is therefore valid.

5. The act for the period of its operation authorizes municipalities to borrow money and issue revenue bonds on the security of the revenues of a municipally owned utility. Such obligation may not be incurred, however, without a vote of the qualified taxpaying electors of the city.

6. Under and pursuant to the provisions of the act, a utility or project, such as mentioned therein, may be acquired by purchase and the revenues therefrom pledged to pay

revenue bonds issued on the security of such revenues. This may be done without a vote of the qualified taxpaying electors, except the transaction is subject to a referendum of the voters as provided in the act.

7. Where improvements or betterments are built into an existing system or project, the revenues earned by such improvements or betterments, based on a proper appraisement of the old system and the improvements and betterments, may be pledged to the payment of revenue bonds as provided in the act without vote of the qualified taxpaying electors, but subject only to the referendum provided for in the act.

8. The appraisement of the waterworks system made by Santaquin City did not fully comply with the requirements of the act in the particulars noted in this opinion, and therefore it is necessary that the writ of prohibition be made permanent.

The order of the court is that the writ of prohibition heretofore issued be made permanent. Costs to plaintiffs.

ELIAS HANSEN and MOFFAT, JJ., concur.

STRAUP, C. J., dissents. For views expressed, see dissenting opinion in case of *Fjeldsted* v. *Ogden City* (Utah) 28 P. (2d) 144.

EPHRAIM HANSON, J., dissents on grounds stated in his dissenting opinion on petition for rehearing in the case of *Fjeldsted* v. *Ogden City*.