## FJELDSTED v. OGDEN CITY et al.

No. 5581.   Decided August 20, 1934.   (35 P. [2d] 825.)

*Thatcher & Young,* of Ogden, for plaintiff.
*Stuart P. Dobbs,* of Ogden, for defendants.

MOFFAT, Justice.

Ezra J. Fjeldsted, heretofore before this court in a cause similarly entitled (*Fjeldsted* v. *Ogden City et al.*, 83 Utah 278, 28 P. [2d] 144, 150), has brought this original proceeding for a writ of prohibition upon which was issued an alternative writ, and he asks to have that writ made permanent against Ogden City, the mayor, city commissioners, city treasurer, and city recorder to prevent the issuance of certain bonds.

The application for the writ sets forth as reasons for its granting and the making of it permanent in subsance the following:

That plaintiff is a taxpayer of Ogden City, and, as such, is interested in the matters alleged. That he brings the proceeding on behalf of himself and all others similarly situated. That Ogden City is a municipal corporation, a city of the second class, under the laws of the state of Utah. That Harmon W. Peery is the mayor and a member of its board of city commissioners. That George O'Connor and Fred E. Williams are the other members of the board. That Murray K. Whitney is the city treasurer. That Ella O'N. Ballantyne is the city recorder. That Ogden City is the owner of a waterworks system consisting of certain enumerated water rights and sources of supply, reservoirs, constructions, and distributing system purchased and constructed at a cost of $1,743,961.81.

"IV. That said City proposes to enter into a project of making repairs, enlargements, extensions and improvements to said city waterworks system in the following particulars:

"A. Replacement of present older supply line, consisting mainly of woodstave construction, from Black Point in Ogden Canyon to reservoirs with pipe of approximately 36 inch diameter to the junction of the two present supply lines, and with pipe of approximately 48 inch diameter from such junction to said reservoirs; together with incidental and appurtenant structures and acquirement of new right of way therefor where necessary or convenient.

"B. Construction and lining of new reservoir of approximately thirty-eight million (38,000,000) gallons capacity, together with appurtenant inlet and outlet structure.

"C. Replacement of distribution lines, including one present main line from reservoirs for approximately one-half mile, and of other distributing lines as required where leakage appears.

"D. Installation of meters on unmetered water connections, including purchase and installation of approximately 6,000 meters.

"E. Construction of such extensions, or enlargements and making of such other improvements and repairs to such system as may appear necessary, or advisable in connection with the above work, to such extent as may be agreed upon with the United States of America.

"V. That for the purpose of carrying out such project the said City has caused an estimate of the cost of the project and of the net operating revenue thereof to be made by a competent engineer approved by the State Engineer of the State of Utah and having no connection with any manufacturer or seller of pipe or other equipment to be used in said project or the installation thereof, or with any private person or corporation engaged in the same business, which estimate has been adopted by a resolution of the Board of City Commissioners of said City, and a copy of which estimate is hereunto attached, marked Exhibit 'A' and hereby referred to and made a part hereof; that thereafter the said City entered into a loan and grant agreement with the United States of America with reference to the procurement of moneys for the completion of such project, a copy of which loan and grant agreement is likewise hereunto attached, marked Exhibit 'B' and is hereby referred to and made a part hereof; and after the entry into such contract did by a two thirds vote of said City Commission adopt and enact on June 20th, A. D. 1934, a certain ordinance of which a copy is likewise hereunto attached, marked Exhibit 'C' and is hereby referred to and made a part hereof, such ordinance purporting to authorize the issuance of $606,000 in bonds of said Ogden City for the purpose of procuring moneys with which to carry out and pay the cost of such project, and among other things to pay the principal and interest falling due upon such bonds from 38.5 per centum of the net revenues out of the waterworks system of said City, as defined in such ordinance.

"VI. That said ordinance, in describing the said project upon which the moneys so obtained are to be expended, describes the same in manner and form as set forth in paragraph number IV hereof and. that the description thereof as contained in Section 1 of such ordinance and hereinbefore set forth, is indefinite and uncertain in that it does not provide what distributing lines, other than one present main line, are to be replaced, and in that it provides for the construction of such extensions and enlargements and the making of such improvements and repairs to the system as may appear to be necessary or advisable in connection with the other work to be done

under such project, and to such extent as said City may agree upon with the United States of America.

"VII. That said ordinance does not comply with the provisions of chapter 22, Laws of Utah 1933, Second Special Session, hereinafter referred to as the Revenue Bond Act of 1933, in this: by the terms of such ordinance the principal of the bonds issued thereunder is not to be made in equal and annual installments but the last installment is in the sum of $25,000 while all previous installments are in the sum of $20,000.

"VIII. That the said ordinance provides the form of the bonds to be issued and that in such bond it is provided that the same shall be payable from 38.5 per centum of the net revenue derived from the operation of said waterworks system of said City, and that such net revenue shall be 'the gross revenue of the said waterworks system after deducting only for the cost of administration, operation and maintenance', while by the terms of section 9 of such ordinance, and by section 10 of such Revenue Bond Act of 1933 it is provided that maintenance shall include all betterments or replacements required to keep such system in good repair and working order; that petitioner apprehends that by reason of the omission from such bond of language calculated to preserve the requirement of such statute and of such ordinance that expenses necessary to preserve said waterworks system in good repair and working order shall be included as a part of the maintenance of such system, the holder of such bonds may not be bound in that respect and that the City by issuance of such bonds will contract for the payment of such per centum from a net revenue fixed by deducting ordinary maintenance but not including all items which would be and should be expended to maintain said system in good repair and working order.

"IX. That in said ordinance in section 5 thereof it is provided that 'Said City will maintain insurance for the benefit of the holders of the bonds, on the waterworks system, of a kind and in an amount which would usually be carried by private companies engaged in a similar type of business. Nothing in this section shall be construed as requiring the said city to expend any funds which are derived from sources other than the operation of the waterworks system.' That by reason of such provision in case of loss to the present system compensable from such insurance, the holders of such bonds will be enabled to recover for their benefit losses paid upon destruction of a portion of such waterworks system not constructed as a portion of such project or from the moneys furnished under the terms of such ordinance and the premiums upon which insurance were paid from the general funds of such waterworks system and not from the 38.5 per centum set apart from the service upon such bond issue.

"X. That the appraisement so made as hereinbefore referred to and so adopted and approved by said City Commissioners as set forth in said ordinance is capricious and arbitrary and without relation to relative revenue derived from the system as at present existing and as proposed to be improved, in this:

"A. That it appears from the estimate of the engineer so adopted that the said engineer has included in the value of the present existing system the water rights appurtenant to said system at their acquirement cost and has not attempted to fix and has not fixed the actual market value of such water rights, nor has he used the value of such water rights at their present actual market value as an item in the appraisement of the present existent value of such system.

"B. It appears from said estimate that the net revenue of such waterworks system for the year 1934, as now constructed and operated will be in the sum of approximately $134,000, and that the maximum estimated increase in net revenue which will result directly and immediately from such project when completed will not exceed $46,000 and will probably not exceed $44,000, but that nevertheless the said ordinance by the provisions of section 8 thereof fixes the net revenue to be set apart to the service of such bonds to be issued under such ordinance at 38.5 per centum of the whole net revenue of such system as so enlarged, extended, repaired, and improved, and the said estimate as so adopted likewise provides for such a division of net revenue.

"XI. That if such appraisement is found to be lawful, nevertheless the allocation of 38.5 per centum of such net revenue to the service of said bonds is not in accordance with the provisions of Section 14 of Chapter 22 for the reason that 38.5% is approximately the proportion of $750,000 against $1,952,453.71, rather than the proportion of $750,000 against $1,202,453.71. That is to say, instead of dividing the revenues according to the values of the contemplated betterments and improvements and the value of existing system and taking 'the proportion of the value of such betterments and improvements as against the value of the previously existing system' the proportion was taken of the value of the waterworks system after such betterments and improvements have been completed."

That the proposed bond issue is illegal and void unless ratified and approved by the qualified voters of Ogden City at an election called pursuant to law for that purpose.

That no such election has been called and no vote had thereon, and prays that the writ issue and be made permanent prohibiting and restraining the taking of any further steps relating to the issuance or sale of said bonds.

For return to the alternative writ issued, the defendants (in the pleadings designated as respondents) each and severally demurred generally upon the ground that the application does not set forth any cause of action nor any ground sufficient to warrant the making of the writ of prohibition permanent.

Strictly held to the limits of the issues raised by the pleadings herein, if the application sets up one valid objection wherein the city by its officers in the proposed bond issue has trespassed beyond the authorized limits and powers vested in them, the demurrer should be overruled and the writ made permanent, for the reason that the only question raised by the demurrer is: Has the applicant "set forth any cause of action"? If he has not, the demurrer must be sustained.

Unfortunately, frequent resort by application for the extraordinary writs by virtue of which the original jurisdiction of this court may be invoked and by which the court is importuned to discuss questions not presented as strictly controverted legal issues, and to pass upon matters in effect amounting in certain instances to emergency economic questions akin to declaratory judgments is increasing. We say "unfortunately" because some of those matters so discussed and argued about are, of necessity, in the last analysis often dicta, and such dicta may thereupon be seized and quoted, cited and submitted with all the vigor and confidence that might be given a solemn decision, rendered upon a definite issue presented upon the law applicable thereto. Cases such as the one before us, which is an echo of the cases of *Fjeldsted* v. *Ogden City et al.,* supra, and *Wadsworth* v. *Santaquin City et al.* (Utah) 28 P. (2d) 161, 172, seek a construction of the latter case and call upon the court to step beyond the issues properly limited, and in a measure to meet, discuss, and reflect certain economic tendencies, which frequently in these dictatorial discussions involve fundamental and important constitutional questions. Thus in the *Wadsworth* v. *Santaquin City* Case, supra, an emergency and special economic

law known as the "Granger Act," and by its terms limited in its operation to a period of two years or upon a proclamation of the Governor to a shorter term, has drawn into question and discussion fundamental constitutional limitations of the Utah Constitution relating to "debts," "indebtedness," and the creation thereof.

In the instant case this court is importuned to read the report of the engineer, and counsel expresses the opinion that the court "must agree that a very well considered picture of the system is there given, and one which clearly shows the *emergency* nature of the situation." (Italics added.)

Haste in legal and judicial matters often affects, adversely, quality. Matters of gravity must be carefully considered and determined and the possible consequences not only present but future must be weighed against any emergency temporarily existing. Hasty presentation following dashed-off opinions may fall far short of appreciating the gravity of the problem. The public is entitled to at least two things from bench and bar, first, an honest and conscientious presentation and consideration of the problems whether public or private, and, second, a competent, correct and efficient solution with a reasonable measure of dispatch. Without these "no man can be sure that he may not be tomorrow the victim of a spirit of injustice by which he may profit today." During periods of depression or excitement things may be urged which later and in the light of experience and greater wisdom and self-restraint are shown to be unwise. Progress is predicated upon the proposition that no government, no matter how wisely or cunningly devised, can be satisfactory at all times to all people; but in spite of this and necessary progress the bonds of law and justice must prevail.

Counsel for applicant have furnished a tabulated schedule of the propositions urged in the *Wadsworth* v. *Santaquin City* Case, supra with the answers thereto as maintained by counsel, given by the court, and, after repeating the two issues as designated by the court that were controlling in the *Wadsworth* v. *Santaquin City* Case, say:

"As we understand the Santaquin decision it holds that the Granger Act hereinafter referred to as the 'Act' is not unconstitutional, and that a proposed loan obtained thereunder does not create a debt 'if the proceedings taken by the borrower comply with the requirements of the Act.' In other words, the Granger Act is constitutional and if future net revenues are properly segregated and allocated so that only the net revenues derived solely from the proposed improvement are pledged, it does not create a debt requiring the proposition to be first submitted to a vote of the taxpayers."

It would serve no good purpose to rediscuss the constitutional principles involved in the Santaquin Case as related to and applied to the Granger Act. Suffice it to say that the matters therein discussed and as thus related are limited to the problems presented in that case. If counsel knew the narrow margin by which the Barnes Case, 74 Utah 321, 279 P. 878, escaped reversal and that such escape was effected only by the limitations imposed upon it in the *Fjeldsted* v. *Ogden City* Case and the *Wadsworth* v. *Santaquin City* Case, and could he further measure the compromising effect of urgent, economic, temporary necessity and the plea of unemployment and emergency relief, the assumption of constitutionality of the Granger Act and the scope of the cases decided might not be so confidently asserted. Why this question could not, and should not have been submitted to a vote of the people in the regular way does not appear. Wisely or otherwise the Barnes Case opened the door of the special fund doctrine. Part of the court thinks the door should not have been opened at all, part that it should have been opened but not so widely, hence the limitations imposed by the later cases. The difficulty before the court in these cases would have been avoided had the door of the special fund doctrine not been opened at all. Having been once opened the court must now meet the difficulties of the problem and new legislation in the light of the decided cases and the effect to be given the new legislation.

However, applicant attacks the validity of the ordinance and justified the making of the writ permanent on six par-

ticular grounds.  Counsel candidly submits that some of them are more or less technical while some of the objections are urged as substantial.

The first objection raised may fall within either group. It may or may not be substantial.  In this case there would seem to be no substantial basis for the objection.  The ordinance in describing the size of pipes to be used at different places uses the expression "of approximately 36 inch diameter" and "approximately 48 inch diameter," and as to the reservoir capacity, "of approximately 38,000,000 gallons capacity."  We think the expressions fairly represent and are limited in application to the proposed constructions and are equivalent to the expressions, "36 inches in diameter and 48 inches in diameter, and of a capacity of 38,000,000 gallons as nearly as the same may be practically approximated."

It is objected the proposal for the "construction of such extensions or enlargements and making such other improvements and repairs to such system as may appear necessary, or advisable in connection with the above work, to such extent as may be agreed upon with the United States of America," might be misleading to the taxpayer or permit the diversion of funds thus proposed to be secured to another purpose, contrary to the limitation imposed by the Constitution of Utah, art. 14, § 5, which reads:

"All monies borrowed by, or on behalf of the State or any legal subdivision thereof, shall be used solely for the purpose specified in the law authorizing the loan."

It was held in the case of the State of Utah ex rel. *Willis* v. *Heber City*, 36 Utah 1, 102 P. 309, that an order or resolution and published notice to electors of an election to vote on an issue of bonds "for general corporate purposes of the city," when in fact the proceeds from the sale of the issue of bonds was intended to be used to construct an electric lighting plant to supply the city with lights was entirely too general.  It was further held that under such notice voters would not know "whether the indebtedness is incurred

to supply and maintain a fire department, grade streets, defray expenses, construct a waterworks system, electric light plant, sewers, or for divers other things." The doctrine as thus laid down is correct, but it may not be applied to the instant case. The ordinance under consideration limits the use of the funds proposed to be obtained to the project; to wit, the waterworks system of Ogden City. As so limited, the funds may not be used for any other purpose. An appropriate statement detailing necessary matter is found in *Moyle* v. *Board of Commissioners of Salt Lake County et al.,* 53 Utah 352, 178 P. 918, 921, where Mr. Justice Frick said:

"While we do not wish to be understood that conditions may not be such as to require a more specific statement in case the construction of a particular bridge across a particular stream was contemplated, yet in view that the object expressed in the notice in question is clear and manifestly for the purpose of improving a large number of roads, and the necessary culverts and bridges as a part of such roads, the notice is not vulnerable to the objection urged against it."

In the case of *State ex rel. Horsley* v. *Carbon County,* 38 Utah 563, 114 P. 522, an analogous situation is considered. See, also, *State ex rel. Utah Savings & Trust Co.* v. *Salt Lake City et al.,* 35 Utah 25, 99 P. 255, 18 Ann. Cas. 1130.

There are, however, further limitations imposed within the general project or purpose declared, amounting to specific parts of the project.

Nor do we think that because the use is further limited "to such extent as may be agreed upon with the United States of America" it is objectionable. The United States, under the ordinance, is expected to purchase the bonds, and, in addition thereto, as an aid in a "make work" project, to contribute 30 per cent of the cost of labor and materials employed on the project, and accept a bond secured only by an allocated fraction of the net income based upon a proportionate "value of the betterments or improvements proposed to be constructed," and which bonds contain a clause that such bond does not constitute nor create a debt or an indebtedness against the city. Under

such conditions it is only a reasonable limitation that the purchaser of the bonds should be interested in and be protected to the extent of seeing to it that the funds supplied should be expended upon that project and not otherwise.

The second objection attacks the ordinance upon the ground that twenty-nine of the annually maturing bonds of the issue are for the sum of $20,000 besides interest while the last year's payment of principal is $26,000.

A literal reading of the statute would require the whole sum proposed to be issued to be divided by the number of years, and fractions or not "the payment of principal on all bonds issued under the provisions of this act shall be made in *equal and annual installments.*" Section 3.

In the *Wadsworth* v. *Santaquin City* Case it was held that a strictly mathematical adherence to the letter of the statute was not required. Comparing the sum involved in the instant case with that in the *Wadsworth* v. *Santaquin City* Case the variation from mathematical equality in the former is not so great as in the latter. There is no merit to this contention.

The third objection is frankly conceded to be unsubstantial and therefore calls for no discussion.

The fourth objection attacks that provision of the ordinance wherein it is ordained that the "*city will maintain insurance for the benefit of the holders of the bonds, on the water works system,* of a kind and in amount which would be carried by private companies engaged in a similar type of business." (Italics added.)

This objection again brings forward the close and troublesome distinction made in the *Wadsworth* v. *Santaquin City* Case in modification of the case of *Barnes* v. *Lehi City,* 74 Utah 321, 279 P. 878. In the case of *Fjeldsted* v. *Ogden City,* supra, it was held that "the special fund rule is not without its limitations." This was said after quoting from the *Barnes* v. *Lehi City* Case in part as follows:

"It has now become a well-recognized principle of law that these constitutional provisions do not apply to a case where public property is purchased or constructed, and payment therefor is to be made, exclusively from the revenues derived from the property."

There was probably a slight misapprehension of the facts in the *Barnes* v. *Lehi City* Case. Had the purchased or acquired property been of the unit type unconnected with, and independent of, any other city property as to operation and income therefrom, the special fund doctrine, by those approving it, could be applied. The difficulty with the *Barnes* v. *Lehi City* Case is that the purchase of the machinery and construction and operation thereof constituted an addition and became an integral part of the electric lighting construction and equipment already owned and in operation by the city.

In the case of *Fjeldsted* v. *Ogden* City, supra, "by the admitted facts * * * a large income from an existing waterworks system owned by the city is pledged to pay the principal and interest on the bonds; the greater part of the property to be purchased or improvements made will be incorporated or built into the existing waterworks system in such manner that it could not be thereafter segregated or withdrawn without destruction of the new property and destructive impairment of the entire system; the city is irrevocably pledged to pay the bonds out of revenues of which the city is now the owner. * * * True, the fund out of which the bonds are to be paid is a special fund, but it is a special fund created by impounding the revenues earned by property of which the city is now the owner, and which, but for the contract, would be available for use by the city in meeting its other obligations." So it was held that such attempted hypothecation of revenue was the creation of a debt within the constitutional prohibitions and could not be created without a vote of the people affirmatively authorizing the same.

Then came the passage of the Granger Act, chapter 22, Second Special Session Laws 1933. Whether section 14 of

chapter 22 of the Second Special Session Laws of Utah 1933, in aid of the National Industrial Recovery Act (48 Stat. 195) was passed to obviate the limitation imposed by the *Fjeldsted* v. *Ogden* City Case may be only surmised.

Then came the *Wadsworth* v. *Santaquin City* Case calling for a construction of the Granger Act, and, in connection therewith, a limited consideration of the *Fjeldsted* v. *Ogden City* Case. In so far as the questions raised in the *Wadsworth* v. *Santaquin City* Case were to be determined by application of the special city charter amendment to the Constitution, or the Constitution itself as thus amended, the Granger Act was held not to be violative of the Constitution. No further commitment was made as to the validity or invalidity of the Granger Act. The court there said:

"Prior to the passage of the act, this court had rendered its decision in the case of *Fjeldsted* v. *Ogden City*. It was held in that case that the proposed bonds, when issued, would constitute a debt within the meaning of the Constitution as it then was, and that Ogden City was without authority to issue and sell bonds secured by the net income derived from its waterworks system because not authorized by vote of the electors, and such bonds, when added to the existing indebtedness of the city, exceeded the constitutional debt limit of the city. The Legislature attempted by its enactment to devise a means whereby a city might, within constitutional limitations, issue and sell its bonds and secure the payment thereof by pledging the net revenues derived from a waterworks system or other public utility or net revenues derived from improvements of or betterments to such system.

"In section 3 of the act it is provided: 'No bond or coupon issued pursuant to this act shall constitute an indebtedness of such * * * city * * * within the meaning of any state constitutional provision or statutory limitation.'

"It is elementary that the Constitution must be regarded by the courts as fundamental law. The power and duty of ascertaining its meaning is a judicial, and not a legislative, function. 12 C. J. 699. Whether the revenue bonds which may be issued under or pursuant to the act create a debt in violation of constitutional debt limits is for the court to determine. Since we hold the act valid and within the power of the Legislature to enact, it would necessarily follow that the bonds issued pursuant thereto do not create debts in violation of constitutional restrictions of section 4, article 14, when duly

authorized by a vote of taxpaying electors required by section 3. The above-quoted statement is therefore no more than a declaration of legislative intent to not exceed its constitutional powers in providing for the issuance of revenue bonds and prescribing the procedure to be followed by cities in issuing such bonds."

Under the Granger Act (section 14) the governing body of a county, city, or incorporated town may, as provided, find and declare "the value of the then existing project or service and the value of the betterments or improvements proposed to be constructed, and the *revenue* derived from the entire project or service, when the contemplated betterments and improvements are completed," and the *revenue* derived therefrom "may then be divided according to such values and so much of the *revenue* as is in proportion to the value of such betterments and improvements" (may) "be set aside and used first * * * for the purpose of *paying* the *revenue* bonds issued for such betterments or improvements, and providing a sinking fund and reserve to discharge the same." (Italics and the word "may" added.)

It would seem there are two definite limitations imposed upon the raising of revenue and purposes to which it may be applied when not falling within the constitutional reference of a debt or indebtedness. The matter is thus stated by Mr. Justice Folland in the *Wadsworth* v. *Santaquin City* Case:

"The act by its terms grants power to municipalities to borrow money and issue bonds on the security of the income to be derived from the operation of public utilities or other projects, including waterworks systems, which it may purchase or construct, and, where such municipalities are the owners of any such project, to borrow money and issue bonds on the security of the net revenues derived from any improvements, extensions, or repairs to such project."

In other words, the governing power may issue securities against the *revenue* derived solely from the value added to and properly found and allocated as the newly invested fund in improvements or betterments; and the application of

such hypothecated and allocated *revenue* is limited by the act to "be set aside and used * * * for the purpose of paying the revenue bonds issued for such betterments or improvements, and providing a sinking fund and reserve to discharge the same."

That part of the ordinance providing for the hypothecation or application of the revenue to any other purpose than that specially authorized violates the provisions of the law and may not be done. The insuring of the present or the improved or bettered system and making the proceeds therefrom in event of destruction usable for payment of the bonds secured only by the net percentage of the revenue derived may not be done. It is equivalent to pledging the property indirectly, and, in event of destruction, the insurance to a purpose not authorized. General funds of the municipality may not thus be used.

Objection No. 5 claims that the attempted allocation was arbitrary, capricious, and void. While the act has provided that the governing body shall determine the value of the existing project, the value of the betterments and the revenue derived from the entire project when completed may be divided according to such values. There appears to be a bit of surplusage, and an omitted word in section 14 of chapter 22 of the act, which, when omitted on the one hand and supplied on the other, provides for an alternative method for determining values of the project and division of revenue in such a way as circumstances may require. That part of the statute reads:

"The governing body * * * may provide, find and declare * * * the value of the then existing project or service and the value of the betterments or improvements proposed to be constructed, and the revenue derived from the entire project or service, when the contemplated betterments and improvements are completed, may then be divided according to such values and (*so much of the revenue as is in proportion to the value of such betterments and improvements as against the value of the previous existing project or service as so determined.*) ('may') be set aside and used" for the payment of the revenue bonds issued and providing a sinking fund.

The words italicized and parenthesized are probably responsible for objection No. 5, and the letter of government counsel raising the question of the basis of allocation. With the words italicized omitted and supplying the word "may," which word ("may") must be supplied, no matter what construction may be resorted to, the possibility of the construction contended for is eliminated. The construction of the section retaining the proposed omission would require one to construe it to modify or would require one to disregard what has preceded, and with which it is in conflict and would result in an allocation of revenue disproportionate to the values evidently intended.

An illustration will make this clear. If the existing project is valued at $100,000 and the proposed betterments are valued at $50,000 and the revenue from the entire project is $15,000 per annum, and if the revenue from the entire project is to be divided in the proportion that the existing project bears to the entire project, the values bear the relation $100,000 to $150,000 or as two to three or $66\frac{2}{3}$ per cent of the revenue must be allocated to the existing project and $33\frac{1}{3}$ per cent of it to the paying of the revenue bonds. While if the revenue be divided "in proportion to the value of such betterments and improvements as against the value of the previous existing project," we would have the following: $50,000 is the betterment investment. $100,000 is the existing investment. The ratio of 50,000 to 100,000 is one-half or 50 per cent. So that under such a division the existing project would be paying on the bond issue to the extent of $16\frac{2}{3}$ per cent in excess of the proper ratio making the last proposed construction in violation of the principle laid down in the cases and the Constitution, and such may not be done without a vote of the people because of hypothecating as security without a vote of the people the vested revenue belonging to the municipality. Such an allocation is directly contrary to the doctrine in the *Wadsworth* v. *Santaquin City* Case. As was properly said in that case:

"The making of a finding and determination of appraised values in this proceeding is somewhat analogous to the determination of benefits by city authorities in special assessment proceedings. The general rule in such cases is that such determination is conclusive and not subject to review by the courts unless based on an erroneous view of the law, or that it was demonstrably erroneous, or was arbitrary, corrupt, or fraudulent, or a manifest abuse of legislative discretion."

The objection to the ordinance in this regard is without merit, as the 38.5 per cent so allocated is based upon the construction of the act as above made and as made in the *Wadsworth* v. *Santaquin City* Case.

Objection No. 6 has been fully covered in the discussion of the fifth objection raised, and nothing further need be said thereon.

We are of the opinion that that part of the ordinance relating to the insurance of the system as provided therein is unauthorized and in violation of the law, and upon that ground, until such provisions are eliminated from the ordinance, the defendants, or respondents, are acting in excess of the power, authority, and jurisdiction in them vested.

For such reasons the demurrer is overruled upon the ground herein set forth and the alternative writ heretofore issued is made permanent. Plaintiff to recover costs.

ELIAS HANSEN, J., concurs.

STRAUP, Chief Justice.

I concur in the result making the writ permanent. In the prior *Fjeldsted* v. *Ogden City* Case and in the *Wadsworth* v. *Santaquin City* Case, I, as shown by my dissenting opinion, 28 P. (2d) 154, was of the opinion that the plans or projects as proposed by the municipalities did not, on the theory of the special fund doctrine, constitute the creation of a debt prohibited by the state Constitution referred to in those cases. While the majority court in such cases, disclaiming an abrogation of the doctrine, yet placed such a limitation on it, which, as I think, greatly impaired the application

of the doctrine and for all practical purposes rendered it ineffectual; and upon such limitation and restriction it was held that the plans as proposed and the obligations to be incurred constituted the creation of a debt prohibited by the Constitution, and thus a permanent writ was granted restraining the municipalities from going forward with their proposed projects. The court, however, in such cases, in effect, indicated that if by the plan or plans proposed provisions be made for a segregation or allotment of net revenues derived from the operation of the entire system after the improvements and betterments are made and a proper allotment made of such net revenues to the old system as it existed before the improvements and betterments were made, the remaining net revenues allotted to the improvements and betterments and the payment of bonds issued to secure funds for the construction of such improvements and betterments restricted to such net revenues so allotted to and derived from the improvements and betterments, such a procedure or process would not constitute the creation of a debt forbidden by the Constitution.

After the opinion in the first *Fjeldsted* v. *Ogden City* Case, the Legislature, by what is called the Granger Act, attempted to promulgate a rule or method of segregating and allotting such net revenues, which, if pursued, the Legislature in its majesty declared should not be considered a debt coming within the constitutional provisions dealt with in the Fjeldsted Case. And so, in view of that case and of the legislative declaration, Santaquin City proposed a plan of improving its waterworks and sewer systems by issuing and selling bonds to raise funds for such purpose and attempted to make a segregation and allotment of net revenues on the theory as indicated and payment of the bonds restricted to the net revenues derived from the improvements and extensions to be made with such borrowed money, but this court held that the proposed segregation and allotments were arbitrary and capricious and thus granted a permanent writ restraining the city from going forward

with the project. We now have this, the second Ogden City Case, where, as indicated in the main opinion and for reasons therein stated, the reformed or substituted plan of the city attempting to create a lien on net revenues to secure the payment of bonds to be issued to raise funds for the construction of the improvements and betterments was faulty and that the plan as proposed still constituted a debt forbidden by the Constitution and thereupon another permanent writ is granted preventing the city from going forward with the proposed project.

Now, while I in the cases referred to dissented from the rulings of the majority court, which rulings, as I think, constituted a departure of the special fund doctrine, I now feel constrained to yield to such departure and to consider the case in hand from such viewpoint. We have here a situation or condition where Ogden City owns a waterworks system, which, because of needed repairs and replacements of worn out and defective conduits and pipe lines, was inadequate to supply the city and its inhabitants with needed water, and because of such defective condition irreparable loss was occasioned in the carriage and distribution of the waters. The city already had a bonded indebtedness of over $1,500,000 which was created by the purchase and construction of the system, but which bonded indebtedness was payable from general taxes to be levied for such purpose, and not out of revenues derived from the operation of the system. It now is deemed necessary and the city proposes to borrow $645,000 for the purpose of making such repairs, improvements, and extensions of the system. The problem to be solved is if such moneys are borrowed with which the repairs, improvements, and extensions are to be made and a lien given to secure the payment of such borrowed moneys on the net revenues derived from or attributable to such repairs, improvements, and extensions, how, when such improvements are made and the system operated as a unit and as a completed system and revenues collected from the use and operation of the entire system, may the

net revenues, with any degree of certainty, be segregated and a portion allotted to what was the old system, and what portion allotted as being attributable to the repairs, improvements, and extensions. From the very nature of things I do not well see how such a segregation or allotment may be made with any degree of certainty, whether on the basis of respective costs, appraised values, or by any other method or process. The old is useful and valuable only as it is used with the new, and the new, as it is used with the old. To segregate the one from the other and attempt to so allot or apportion the revenues derived from the operations of the whole is as difficult and impracticable as to segregate and allot benefits of a jackknife where a new blade is put in an old handle and a portion of the benefits attempted to be segregated and allotted to the handle and a portion to the blade. And in the first *Fjeldsted* v. *Ogden City* Case it was conceded by the parties that it was impractical, if not impossible, after the improvements were made and the system operated with them, to determine what of the net revenues derived from the operation of the entire system were attributable to or occasioned by the improvements and what attributable to the old system. As said in *Seward* v. *Bowers,* 37 N. M. 385, 24 P. (2d) 253, 255, with respect to a similar question, "it would be a physical impossibility to determine what portion of the proposed revenue is attributable to the improved plant in its entirety, to the improvements alone, or to the present plant." To that effect is also the case of *Searle* v. *Town of Haxtun,* 84 Colo. 494, 271 P. 629.

The Granger Act does not add anything to or aid the proposition. The Legislature may not declare what is or what is not in contravention of the Constitution, or even in an emergency or desperation lift itself by its own boot straps over barriers of the Constitution. Whether whatever plan or project which may be proposed is or is not the creation or incurring of a debt forbidden by the Constitution, is, and as was said in the Santaquin Case, a judicial and not a legislative question.

Thus since the departure from the special fund doctrine and because of the impracticability of segregating or allotting net proceeds derived from the operation of the entire system after the improvements are made, I am of the opinion that the only method now open to the city to legally incur the proposed obligation and go forward with its project without offending constitutional provisions is by a submission of the proposition to a vote of the qualified electors having paid a property tax and a majority of them voting in favor of the proposition. That was not done; and that is what the petitioners from the start urged was required to be done to lawfully incur the proposed obligation and go forward with the project. I therefore concur in making the writ permanent.

FOLLAND, Justice.

I concur in the opinion of Mr. Justice MOFFAT. It must be admitted that the ordinance provision with respect to insurance is vague and indefinite. As now worded it bears the construction that the proceeds from insurance in case of loss would be used solely for the purpose of retiring bonds. As so construed, the provision is clearly open to the objections urged against it and for the reasons stated by Mr. Justice MOFFAT the writ should be made permanent. I see no objection, however, to the carrying of insurance for the protection of the system or any part thereof against fire, earthquake, or other hazard, where the premiums are payable from the operation and maintenance fund and the proceeds in case of loss are subjected to the rehabilitation of the system or the parts thereof damaged or destroyed. By this arrangement the city as well as the bondholders would be amply protected.

EPHRAIM HANSON, Justice.

I concur in the order of the prevailing opinion of Mr. Justice MOFFAT making the alternative writ permanent. I do so solely for the reasons stated by Mr. Justice FOLLAND in his concurring opinion, in which I also concur.